<hr />

## In re KAPLAN et al.

### (District Court, E. D. Pennsylvania. December 16, 1905.)

### No. 1,997.

BANKRUPTCY—DISCHARGE—OBTAINING CREDIT ON FALSE STATEMENT.

> An objection to the discharge of bankrupts under Bankr. Act July 1, 1898, c. 541, § 14b (3), 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427], as amended in Act Feb. 5, 1903, c. 487, 32 Stat. 797 [U. S. Comp. St. Supp. 1905, p. 684], on the ground that they obtained property on credit from the objecting creditor upon a materially false statement in writing, further specified as being a statement in writing of their assets and liabilities made for the purpose of obtaining a loan, is not sustained, where the evidence shows that the statement was given to the creditor 10 weeks before the loan was made, that he refused to make a loan thereon, and afterwards made it on security given at the time and which was deemed by him sufficient.

In Bankruptcy. On review of report of referee.

The following is the report of Referee David Werner Amram:

An adjudication in bankruptcy in the above matter was entered on August 10, 1904, and the cause referred to me as referee. Thereafter the bankrupts filed their petition for discharge, and Daniel Myers, Jr., of Philadelphia, one of their creditors, filed specifications of objection thereto. On March 22, 1905, your honorable court referred the said petition of the bankrupts for their discharge and the specifications of grounds of opposition to me to ascertain and report the facts with the testimony and my findings thereon. In compliance with the said order I gave due notice to the attorneys for the bankrupts and the objecting creditor, and held a meeting for hearing upon the said objections on April 4, 1905, at 3:30 p. m., when I was attended by the bankrupts and their attorney Bernard Pockrass, Esq., and the objecting creditor and his attorney, Henry N. Wessel, Esq. Testimony was taken at this meeting, and the meeting was adjourned from time to time for the purpose of taking further testimony. A record of the said meetings and a transcript of the testimony taken is hereto attached.

The objection to the bankrupts' discharge is based upon section 14b (3) of the bankruptcy law (Act July 1, 1898, c. 541, 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427]), to wit, that the "bankrupts have hitherto and prior to their adjudication in bankruptcy, obtained from this deponent property on credit upon a materially false statement in writing made to this deponent for the pur-

pose of obtaining such property on credit"; specifying more particularly that on February 4, 1904, the bankrupts requested a loan of $300 from the objecting creditor, and made and submitted for his consideration a statement in writing as follows:

"To D. Myers, Jr., of Philadelphia:

"The undersigned, for the purpose of procuring credit from time to time from you for the negotiable paper of the undersigned or otherwise, furnish you with the following statement which fully and truly sets forth the financial condition of the undersigned on the 4th day of Feb. 1904, which statement you can consider as continuing to be full and accurate unless notice of change is given you. The undersigned agree to notify you promptly of any change that materially reduces the pecuniary responsibility of the undersigned.

| Assets. | | Liabilities. | |
|---|---|---|---|
| Real Estate (Asse'd Value $.......) | | Mortgages.................................. | $9 000 |
| Market Value......................... | $12 000 | Bills Payable........................... | |
| Merchandise on hand cost............. | 7 000 | Amount due for merchandise on | |
| Merchandise in transit................ | | hand.................................. | 3 000 |
| Bills Receivable....................... | 75 | Amount due for merchandise in | |
| Outstanding accounts new............. | 800 | transit............................... | |
| Outstanding accounts 6 mos. old..... | . | Other liabilities not specified above.. | |
| Cash in bank and on hand........... | 500 | Loans from Banks or Trust Co...... | |
| Machinery and Fixtures.............. | | | |
| Horse and Wagon..................... | 500 | | $12 000 |
| Other assets not specified above..... | | | |
| | $20 875 | | |

| | |
|---|---|
| Description of Real Estate and in Whose Name................. | in my name House & Lotte 710 S. 5th St Lotte 26 X 37 Feet |
| Do You Borrow on Accounts Receivable?........................ | No. |
| What Banks or Trust Company are You Depositing With?...... | Centeral. |

Have You Given Judgment Notes to Any Person or Firm
    to Secure Them? Answer No.................................    No.
To What Extent are Endorser on Other Paper? Answer No...    No.
Insurance Carried on Real Estate. $9,000.00. On Stock. $8,000.00.
Do You Carry Life-Insurance? Yes. What Amount? $25,000...
To Whom Payable? In our name.

"The above is a true statement of our condition this fourth day of Feb., 1904.
"[Signed]                         Nathan Kaplan.
                                  "Frank Skwersky.
                                  "Kaplan & Skwersky."
Indorsed: "Statement Kaplan & Skwersky, made February 4, 1904."

—and that the deponent relying upon this statement loaned the bankrupts the sum of $300 in cash.

The objecting creditor further avers that the statement was materially false in four particulars: (1) That the bankrupts did not own the real estate mentioned in said statement. (2) That they did not have on hand merchandise to the value set forth in said statement. (3) That they owed more than $3,000, as stated by them. (4) That they had given judgment notes to divers persons, firms, and corporations.

The statement in writing above referred to was offered in evidence, and it is admitted that the signatures thereto are in the handwriting of the bankrupts.

From the testimony taken before me, I find and report the following facts:

That on February 4, 1904, the bankrupts called on Daniel Myers, Jr., the objecting creditor, at his office in the building of the Central Trust Company, Philadelphia, and asked him for a loan of $500. At that time, Kaplan, one of the bankrupts, was about to purchase a house and lot 710 South Fifth street, Philadelphia. Myers requested them to give him a statement of their financial condition. Kaplan informed him that he was about to purchase the above-mentioned property, the price of which was $12,000, and that a mortgage of $9,000 was to be placed on it; that he valued the business of the firm at $7,000,

and that they owed $3,000; that they had bills receivable of $75, new outstanding accounts of $800, cash in bank and on hand $500, and a horse and wagon worth $500; that he carried no life insurance, but that his partner Skwersky had a policy for $1,000.

At the time of this interview Myers, the objecting creditor, using one of the blanks of the Central Trust & Savings Company, with which he was connected, prepared a statement from the answers of Kaplan and offered it to the bankrupts for their signature. They signed it, and were told by Myers to come in a few days for an answer. A few days later Skwersky, one of the bankrupts, called on Myers, the objecting creditor, who then told him that he declined to give him any money on account of the statement, but suggested that if the bankrupts could give him any real estate security he would make the loan. Skwersky left Myers without receiving the money and thus the matter ended.

On February 9th, five days after the above statement was given, the property above referred to, 710 South Fifth street, was bought by Kaplan, one of the bankrupts, whose cash book shows that on that date he paid to William H. Moss $585; $500 of which was on account of the purchase price of this piece of real estate. More than two months after these events the bankrupts renewed their application for a loan with Myers, who again declined to make it because they had no real estate. He was informed, however, by Skwersky that he (Skwersky) had paid in $208 on account of the 20-year endowment policy on his life for $1,000, and Myers agreed to make a loan of $200, if this policy were assigned to him as collateral security. Skwersky told Myers that $200 was not enough for him, and the latter then agreed to make a loan of $300, provided the policy of life insurance was assigned to him, and the bankrupts would give him their judgment note for $300. This was agreed to and on April 18, 1904, the judgment note signed by the firm and by Skwersky individually for $300 was delivered to Myers, and Skwersky's policy of life insurance issued by the New York Life Insurance Company for $1,000, was assigned to him, and he thereupon paid over to Skwersky $282, deducting $18 for reasons which do not appear in evidence.

I am convinced from the testimony that the objecting creditor did not make the loan of $300 on April 18, 1904, on the faith of the statement signed by the bankrupts on February 4, 1904. His answers to questions on this point are significant: "Q. Why didn't you give them the money when the statement was signed? A. Because it didn't suit me at that time. Q. Why didn't it suit you at that time? A. Because I didn't feel like giving it to them at that time. Q. Why didn't you feel like giving it to them at that time? A. I can't tell you." Immediately before giving the above answers he was asked: "Q. Then you did not give them any money on the strength of this statement?" to which he replied: "A. Yes; that statement had a great deal to do with it. That had all to do with it. If they were perfectly responsible, the way they had been telling me."

In spite of this answer of Myers, I am convinced from his other answers and from the other testimony in the case that the statement had nothing to do with the loan, and that he made the loan to them on what he believed at that time to be entirely good security without considering the statement which they had made to him 10 weeks before. In view of these findings of fact, I am of the opinion that the objecting creditor has failed to prove, as required by the bankruptcy law, that the bankrupts obtained property on credit from him upon a materially false statement in writing made to him for the purpose of obtaining such property on credit, and that therefore the objections to the discharge should be dismissed and the discharge granted.

Counsel for the objecting creditor has argued that the printed words at the head of the statement of February 4, 1904, are of such a character as to bind the bankrupts by the statements made and to justify the objecting creditor in offering the statement as a basis for his objection to the discharge.

The following are the printed words at the head of the said statement: "The undersigned, for the purpose of procuring credit from time to time from you for the negotiable paper of the undersigned or otherwise, furnish you with the following statement, which fully and truly sets forth the financial

141 F.—30

condition of the undersigned on the ——— day of ——— 190—, which statement you can consider as continuing to be full and accurate unless notice of change is given you. The undersigned agree to notify you promptly of any change that materially reduces the pecuniary responsibility of the undersigned." The blanks in the above heading were filled in with the date February 4. 1904. It may very well be that if a loan had been made by Myers on or about the 4th day of February, 1904, on the faith of this statement, and that subsequently, say 10 weeks later, a new loan had been made, the statement might have with justice been considered to be still in force, and its contents, true or false, binding on the bankrupts. In other words, it might then be considered a continuing statement, but in view of my findings of fact that no loan whatever had been made on this statement, and that the loan actually made was 10 weeks after the statement was given upon security not mentioned in the statement, I cannot agree with the conclusion of law urged by the attorney for the objecting creditor that this is a continuing statement and binding on the bankrupts. This would only be possible in one of two cases, either that a loan had originally been made at the time when the statement was given and the statement thus kept alive, or that it was clearly understood between the parties, and appeared so from the evidence, that notwithstanding the fact that the loan was made 10 weeks after the statement was given the statement was considered by both parties to be still in full force.

Thus far, I have not considered the question of the truth or falsity of the statement, believing that this is an immaterial matter in view of my finding that the statement was not the basis of the credit. The circumstances surrounding the execution of the statement and certain facts in the statement itself have raised the gravest doubt in my mind as to whether the bankrupts were really advised of the nature of the statement that they were signing. The bankrupts are both illiterate men. The transaction took place in the office of Myers in the Central Trust Company's building. The only other person present was Mr. Myers' stenographer, and her testimony as to the circumstances is not convincing. She was called as a witness by the objecting creditor and said among other things: "They [the bankrupts] didn't seem to understand the questions, so Mr. Myers read them off to them, and they answered them, and he wrote it down as they answered them. It was then reread to them, and they said it was correct and signed it. And I wrote on the back the name, and when it was made, and put it in Mr. Myers' safe." I am convinced that this statement of the stenographer is not true, because there are at least two facts in the statement which must necessarily have led to some dispute and change in the statement before signature. One of these facts is the answer to the question "Q. What banks or trust company are you depositing with?" and the other is the answer to the question as to what amount of life insurance was carried. To the first of these questions the answer appearing in the statement is "Centeral." Now this paper was signed in the building of the Central Trust Company and was written by Mr. Myers, who is connected with the Central Trust Company, and yet, it appears positively from the testimony that the bankrupts never had an account with the Central Trust Company or the Central National Bank. I cannot believe that the bankrupts would make a statement like this if it were not true, and therefore, am driven to the conclusion that they did not make the statement. I cannot believe, that the bankrupts would have the audacity to go into the building of the Central Trust Company and attempt to do business with a person connected with that institution and try to make him believe that they were depositors in that institution when, as a matter of fact, they were not. The statement shows that to the question concerning the amount of life insurance carried by the bankrupts the answer is $25,000. I do not believe that this statement was read to the bankrupts and that they admitted it to be correct. It is improbable on the face of it considering the financial standing of the bankrupts as shown by other parts of this document: it is admitted by Myers in his testimony to be a clerical error on his part; and it seems to show upon careful inspection that the figure "2" has been written over the figure "1." There is no evidence as to the latter point and it is the result of my own examination with a low-power magnifying glass.

The testimony of the stenographer shows an unmistakable desire on her part to make her statement as favorable as possible to the objecting creditor. She even went so far as to say that the check for the loan was given immediately after the statement was signed; but, under cross-examination, she was obliged to modify her statement. The fact is that no money was given at all until 10 weeks thereafter. She also appeared anxious to make it clear that she was present and heard the entire conversation between Mr. Myers and the bankrupts but was obliged to admit that part of it was in German, part of it in English and part of it in Hebrew, and that she only understood the English. I believe that this lady's linguistic acquirements do not warrant her in stating that part of the conversation was in Hebrew; what she probably meant was that the German spoken by the parties was not the classical German, but the dialect spoken by immigrant Jews of Eastern Europe. · She furthermore stated that she left Mr. Myers' employ about January or February, 1905; whereas, Mr. Myers, testifying before me on April 4, 1905, said: "I had a young lady there. She was attending to my books. Miss Perkins. She is still there yet." There can be no doubt that on February 4, 1904, the matter of the financial standing of the bankrupts was discussed, and that Mr. Myers wrote down, in the statement which the bankrupts signed, certain facts which he testified were the facts as he understood them, or to quote his words: "Just what I understood them to said I put down." * * * "I put down just exactly as they told me—as I understood them. Put down exactly word for word just exactly what I understood they told me, and I believed it was true." If these facts are falsely stated, it is due to Myers' own carelessness. If I may guess at what occurred at that interview it was probably something like the following: The bankrupts having told Myers that Kaplan was about to buy a piece of real estate for $12,000, and place a $9,000 mortgage on it, Myers probably said: "Well, if that's the case, we'll put down the value of that real estate at $12,000 and a mortgage at $9,000," to which the bankrupts probably assented. Then Myers probably asked them, "What is your business worth?" and they probably said to him, "It cost us more than $7,000," meaning thereby, as they actually explained in their testimony, that their merchandise, license, and other expenses in connection with the establishment of the business from and after June 1, 1903, was upwards of $7,000. Myers probably said, "Well, we'll put down $7,000," to which the bankrupts again assented.

It is possible that in a similarly careless manner Myers suggested to the bankrupts that they ought to deposit in the Central Trust Company, the institution with which he is connected, and that they agreed to this, and that he then put down the word "Central" after the question, "What banks or trust company are you depositing with?" Indeed, this thought was suggested by counsel for Myers in his argument after the testimony had been closed. There is no evidence whatever in support of the statement in the specification of objection that the bankrupts "were in debt to a greater extent than $3,000 as stated by them."

The only point about which I have serious doubts is the alleged answer of the bankrupts to the question, "Have you given judgment notes to any person or firm to secure them?" the answer being "No." It is uncontradicted that on the 4th of February, when this statement was given, the bankrupts had outstanding judgment notes given to various persons and amounting altogether to $500. All of these notes were made the basis of proofs of claim filed in this cause. The answer of the bankrupts, therefore, if given as appears in the statement, is clearly untrue. The bankrupts, however, aver that this answer was not given, and that at the time when their signatures were attached to the statement of February 4th, the answer "No" to this question, as well as the answers to all the other questions following it, did not appear, and that these blanks must have been filled in subsequently by Mr. Myers. I cannot believe that this is a correct explanation, and I am obliged to conclude that this was a false statement; but as Mr. Myers was not injured by it, it is not material. The important fact in this case is that Myers did not give credit on the faith of the statement notwithstanding his averment that he be-

lieved it to be true. The hesitation of a business man of Mr. Myers' experience to make a loan of $300, or even $500, on a statement which shows an excess of assets over liabilities of $8,000 cannot be explained on any other ground than that he did not believe the statement to be true, or that he knew the real facts to be different than those set forth in the statement, the latter being merely his own careless method of recording the substance of his talk with the bankrupts.

In view of the foregoing I recommend to your honorable court to dismiss the specifications of objection to the discharge, and enter a decree discharging the bankrupts.

Exceptions to report of special referee sur specifications of objection to bankrupts' discharge.

And now, to wit, this 15th day of September, 1905, comes Daniel Myers, Jr., objecting creditor, by Henry N. Wessel, Esquire, his attorney, and excepts to the report of the special referee in the above cause and assigns the following reasons:

(1) The learned special referee erred in finding as follows: "Kaplan informed him that he was about to purchase the above-mentioned property, the price of which was $12,000, and that a mortgage of $9,000 was to be placed on it, that he valued the business of the firm at $7,000."

(2) The learned special referee erred in finding that Kaplan informed Myers "that his partner, Skwersky, had a policy for $1,000."

(3) The learned special referee erred in finding that a few days after the statement was given "Skwersky, one of the bankrupts, called on Myers, the objecting creditor, who then told him that he declined to give him any money on account of the statement, but suggested that if the bankrupts could give him any real estate security he would make the loan. Skwersky left Myers without receiving the money, and thus the matter ended."

(4) The learned special referee erred in finding as follows: "I am convinced from the testimony that the objecting creditor did not make the loan of $300 on April 18, 1904, on the faith of the statement signed by the bankrupts on February 4, 1904."

(5) The learned special referee erred in holding that "the objecting creditor has failed to prove, as required by the bankruptcy law, that the bankrupts obtained property on credit from him upon a materially false statement in writing made to him for the purpose of obtaining such property on credit, and that therefore the objections to the discharge should be dismissed and the discharge granted."

(6) The learned special referee erred in holding that the statement in this case was not a continuing statement and binding on the bankrupts.

(7) The learned special referee erred in finding as to the answer concerning the insurance question "that the figure '2' has been written over the figure '1.' There is no evidence as to the latter point, and it is the result of my own examination with a low-power magnifying glass."

(8) The learned special referee- erred in his recommendation to the court which was as follows: "In view of the foregoing I recommend to your honorable court to dismiss the specifications of objections to the discharge, and enter a decree discharging the bankrupts."

Order overruling exceptions:

And now, September 18, 1905, the exceptions of the objecting creditor to the report of special referee are dismissed. In the seventh exception the finding of the special referee is not correctly quoted.

Bernard Pockrass, for bankrupts.
Wessel & Aarons, for objecting creditor.

HOLLAND, District Judge. The referee's findings of fact, conclusions of law, and recommendation are approved, and the excep-

tions thereto are dismissed. And now, to wit, December 16, 1905, it is directed that the specifications of objection to the discharge of the said bankrupts are dismissed, and a decree discharging said bankrupts is directed to be entered, upon filing proper papers showing a conformity with all legal requirements.