In re LIVERMORE.

No. 93.

Circuit Court of Appeals, Second Circuit.

April 4, 1938.

Horace M. Gray, of New York City, for appellant.

Rosenberg, Goldmark & Colin, of New York City, for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

April 18, 1931, the bankrupt filed his petition and was later adjudged a bankrupt, and on July 10, 1931, he applied for his discharge. Specifications of objections to discharge were filed by appellant and the bankrupt filed exceptions thereto. A master's report overruling the objections and recommending a discharge was confirmed by the court below.

The bankrupt was a general partner of Morgan, Livermore & Co., a stockbrokerage firm, which was organized in 1910. In 1919, one Starr, who owned a stock exchange seat, became a floor member. Starr had no other capital invested nor any interest in the profits beyond the commissions paid as a Stock Exchange member on the business transacted by him on the floor of the Exchange. About January 1, 1926, the firm was in financial difficulties, and between that date and the end of June, 1926, three financial statements, which it is claimed were false and resulted in an extension of credit to the firm, were issued to: (a) the appellant; (b) the Chemical National Bank, and (c) the New York Stock Exchange.

August 27, 1926, the firm entered into a liquidation agreement with its creditors. This was made possible by the bankrupt and his partner obtaining cash loans amounting to $440,000 and the proceeds ($150,000) of the sale of Starr's Stock Exchange seat. The appellant contributed a forbearance of his claim. In making this settlement the firm's obligation to M. L. Biedermann & Co., an Austrian banking house, was ignored. A promise was made by the bankrupt and Morgan to reimburse Starr for the proceeds of the sale of his seat. The liquidation fund was insufficient to do so. Starr sued to recover on this promise in the state court in November, 1930, and March 12, 1931, assigned his claim to the appellant. Other relevant facts will be brought out in the course of the opinion.

The first specification to be considered relates to the failure of the firm, with the bankrupt's knowledge and consent, to keep books "from which its financial condition and business transactions might be as-

certained." Appellant claims that a false asset of $399,810.09 was set up in Exhibit 72, resulting from a writeup of $400,000 on the June 30, 1922, debit balance. A "Paris Office Account," a "Revenue Mines Account," and an "Account 100" appear to have been involved in this. As far as the record discloses, all the entries with respect to this transaction were made in the summer of 1922 while Livermore was living abroad. He lived in Paris, where he transacted the business of the firm, until the fall of 1924. He made occasional visits to New York during this period, but was not there when these entries were made. He was in New York in 1922 for about two weeks in March or April, but was definitely not there again at any time after May 1, until the spring of 1923. The testimony of the bookkeeper of the firm from 1920 to 1925 fails to disclose any intimate knowledge on the part of the bankrupt as to the books. Upon this record the special master found "the practical impossibility of the bankrupt knowing anything about the entries kept in New York at a time when he was living in Europe." This finding is supported by the record.

■ In 1924 this alleged false asset of $399,810.09 was transferred to an account in the "dead ledger" against O. deLubersac & Cie. An account "T B 444," which had a debit balance of $512,828.18, was also included in the "dead ledger" total of $983,047.19. Appellant claims that these accounts were carried as assets throughout 1926. However, the evidence established that the items in the "dead ledger" were disregarded entirely in the determination of the financial condition of the firm and there is nothing in the record showing that they were ever taken into consideration when the financial statements of the firm were issued.

The next specification to be considered relates to a statement issued to appellant April 9, 1926, and in reliance upon which he claims to have advanced to the firm $250,000 on April 19, 1926, and $72,483.82 on July 15, 1926. This statement of the firm's financial condition was presented to appellant by the bankrupt and his partner, Morgan, to induce him to become a special partner. It showed a net worth of $1,427,946, with distribution rights as follows:

| | |
|---|---|
| M. L. Biedermann | $550,000.00 |
| W. T. Starr | 215,000.00 |
| P. W. Livermore | 331,473.10 |
| W. F. Morgan | 331,473.19 |

This statement is claimed to be false because it states Starr's capital to be $215,000, and treats the Biedermann $550,000 as capital, whereas it is alleged to be a liability. Appellant does not present any argument with respect to the advance of $250,000 which was disallowed by the master, and we see no reason to disturb his ruling.

■ Starr had a seat on the Stock Exchange which was subsequently sold for $150,000. He testified that he was a general partner so far as firm creditors were concerned. Therefore, this seat should be considered his contribution to the firm, at least in the case of outside creditors, and no objection can be raised to treating it as an asset of the firm. There is no evidence to show any overvaluation in computing Starr's capital interest in the firm.

■ In 1924, M. L. Biedermann & Co. deposited $750,000 with the firm for the purpose of becoming a special partner. During 1924 and 1925 efforts were made toward effecting this end. The Biedermann money was used and interest was paid thereon. However, the Stock Exchange rules forbade a foreign corporation from becoming a member of a firm here, and on May 19, 1926, it was finally determined that Biedermann & Co. could not become a partner. But Biedermann & Co. had agreed to become a partner in the firm, and in all the negotiations between it and Morgan, Livermore & Co. it was continually referred to as a partnership arrangement. While these negotiations were going on, the moneys had been advanced as if he were to become a partner. Although a partnership was not approved by the Stock Exchange, it is clear that one did exist as between the parties. It was permissible therefore to carry this $550,000 as capital rather than as a liability.

■ Moreover, it is clear that appellant received the statement of April 9, 1926, in connection with an investment he was to make in the firm and not in connection with the deposit of $72,483.83 in his trading account, made three months later. He traded in the market and used his full deposit in the purchases of stock. Furthermore, it is not the type of statement ordinarily given to procure credit, being only an analysis of the net worth of the firm, not a regular statement of assets and liabilities. Thus, it seems clear that appellant never extended credit to the firm in reliance upon the statement of April 9, 1926.

■ It is also claimed that the statement was false in not revealing the true

state of affairs with reference to a commitment of the firm to buy certain stock. On November 20, 1925, the firm underwrote 40,000 shares of stock issued by Kelly-Springfield Truck & Bus Company agreeing to furnish $900,000 on or before March 23, 1926, and also agreeing to an obligation to purchase the stock for a total underwriting commitment of $1,400,000. This was subsequently changed for an agreement to alter the capital structure of the Truck Company and for the firm to purchase 100,000 shares of the new stock at $14 per share. The statement of April 9, 1926, lists 32,000 shares of the Kelly-Springfield stock at a value of $480,-000. There is nothing in the record to show that this was not the true value of the stock on April 9, 1926. In fact, the balance sheet of the Kelly-Springfield Company as of March 31, 1926, shows a book value of over $21 per share. It is true that when appellant deposited the $72,483.82 with the firm, the Truck Company venture had apparently begun to go bad. But this does not show that the statement of April 9, 1926, was false when issued. Furthermore, the evidence shows that by this time appellant was aware of the Kelly-Springfield commitment and that the firm was urgently in need of money because of it.

■ Another specification refers to a statement given to the Chemical National Bank on May 12, 1926, which is claimed to be false in not including an outstanding note of the firm in the amount of $395,000. Appellant contends that this note was a direct obligation of the firm and should have been included as a current liability. This note was held by the Chemical National Bank and it knew it was not included in the statement and recognized that it should not be included for it was a contingent liability. Several officers of the bank testified that the note was a contingent liability and also that they did not rely upon this financial statement anyway, in extending credit to the firm.

■ The last specification relates to a financial statement given to the New York Stock Exchange. On February 17, 1926, the Stock Exchange required a financial statement of the firm as of the close of business February 28, 1926. The Exchange required of its members a minimum ratio between liquid capital and customers' margin commitments of 5 per cent. so the brokers would be able to protect their call loans. March 30, 1926, a statement was submitted to the Stock Exchange, which was found to show a 2.7 ratio which was regarded as a critical condition. There was a hearing before the Business Conduct Committee of the Exchange, and Morgan, Livermore & Co. were given six weeks in which to try to better the situation. June 18, 1926, another statement was rendered to the Exchange which showed a ratio of 15 per cent. Appellant contends that the statement of June 18 was false in not properly showing the alleged $395,000 current liability to the Chemical Bank; in treating Starr's Stock Exchange seat and the Biedermann moneys as capital; and in considering the "dead ledger" accounts as assets. So far as relevant, these items have all been discussed above. Appellant also makes some claim with reference to the ratio shown by this statement, but there is not charged in the specifications that by reason of a false statement as to the ratio, or working capital, the Stock Exchange was induced to continue the firm as members of the Exchange. There was also testimony by several members of the Business Conduct Committee that they had no recollection of ever having seen the statement of June 18, 1926. In any event, appellant does not show that any credit was ever extended to the firm on the faith of this statement.

We are satisfied that a discharge may not be refused by virtue of these statements or the manner in which the books were kept, under the provisions of section 14b of the Bankruptcy Act, as amended, 11 U.S.C.A. § 32(b).

Judgment affirmed.

CHASE, Circuit Judge, dissenting without opinion.