**In re Charles Paul CULP, Debtor.**

**P. David NEWSOME, Jr., Trustee, Plaintiff,**

v.

**Charles Paul CULP, Defendant.**

**Bankruptcy No. 91–03050–W. Adv. No. 91–0354–W.**

United States Bankruptcy Court, N.D. Oklahoma.

June 2, 1992.

G.W. Turner, III, Tulsa, Okl., for plaintiff.

Charles Paul Culp, pro se.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MICKEY DAN WILSON, Bankruptcy Judge.

Upon consideration of the record in the above-styled case and adversary proceeding, and in Case No. 88–01859–W (SIPA) In re Fitzgerald, De Arman & Roberts, Inc., Adv. No. 90–0045–W Newsome v. Culp, the Court determines, concludes and orders as follows.

The Court adopts and incorporates herein by reference its "Order Granting Partial Summary Judgment" in Case No. 88–01859–W (SIPA) In re Fitzgerald, De Arman & Roberts, Inc., Adv. No. 90–0045–W Newsome v. Culp, published as *In re Fitzgerald, De Arman & Roberts, Inc. Newsome v. Culp ["In re FDR"]*, 129 B.R. 652 (B.C., N.D.Okl.1991), which identifies the parties and makes certain determinations of fact and conclusions of law.

By said order, on July 16, 1991, this Court ruled that the *D'Oench, Duhme* doctrine applied in favor of SIPC, and that accordingly Culp owed the Trustee a debt on a promissory note (after setoff of $5,000 owed to Culp) "in the net amount of $555,-181.01" not counting any interest, attorney fees, and costs. After trial on August 12, 1991, the Court determined that Culp also owed the Trustee $171,284.74 for prejudgment interest "in accordance with the express terms of the note," postjudgment interest "relating to principal and interest under the note ... at the rate of 12 percent per annum," attorney fees of $9,197.50 "as provided by the express terms of the ... note," and court costs of $120.00, all as evidenced by a "Judgment" filed on August 15, 1991.

Less than two weeks after filing of the judgment, i.e. on August 28, 1991, Culp and his wife Alice Ruth Culp filed their joint voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court. In said case, the last day to file complaints seeking exception to discharge was fixed as November 19, 1991, and before expiration of said period was extended to December 19, 1991.

On December 19, 1991, the Trustee filed his complaint commencing the present adversary proceeding, seeking "judgment ... determining Culp's debt to the Trustee in the amount of $735,783.25 to be nondischargeable under both 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6)." This sum represents the net amount of the note plus prejudgment interest, attorney fees and court costs as determined by the prior judgment, but does not include postjudgment interest as awarded by the prior judgment. On January 9, 1992, Culp filed his "Answer ..." *pro se.* Culp alleges at least one new fact, i.e. "that at least two other traders for FDR accounts were asked to sign notes for FDR under like circumstances, but refused to do so," answer p. 2 ¶ 3. On March 6, 1992, the Trustee filed his "... Motion for Summary Judgment" and a "... Brief in Support ..." thereof. On March 23, 1992, Culp filed his response to the motion for summary judgment and brief in support thereof; but his response does not squarely meet the legal points asserted by the Trustee. As is its usual practice, "[t]his Court will not grant summary judgment merely in default of a[n adequate] response ... [but] will consider whether or not the motion itself is sufficient to overcome the answer," *In re FDR,* 129 B.R. p. 657.

■ As a preliminary matter, Culp expresses his "feel[ing]" that

... this Court's continued participation in this matter could place the Court in an embarrassing situation. [Culp] is in possession of [the order *In re FDR* ] stating the Court's opinion of [Culp], as determined in a previous motion by the Trustee. It would seem to place the Court in the position of being forced to reverse its previous decision in order to find in [Culp]'s favor in this proceeding. It also

would appear that the Court's Judgement would precede this hearing. The Court has a reputation for fairness and justice. Therefore, [Culp] will not ask the Court to disqualify itself from further participation in this matter, only that the Court give serious consideration to these points and to inform [Culp] of its decision,

answer pp. 1–2 § 2. Judges are required to consider their own actual impartiality and the reasonable appearance of impartiality before permitting themselves to render judgment, 28 U.S.C. § 455. However, judges are not expected to disqualify themselves merely because they have made some previous ruling against someone, *Frates v. Weinshienk,* 882 F.2d 1502, 1506 (10th Circ.1989), cert.den. 494 U.S. 1004, 110 S.Ct. 1297, 108 L.Ed.2d 474 (1990), quoting *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 965 (5th Circ.), cert.den. 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980). After all, judges must rule "for" someone and "against" someone every time they rule at all; and it is unreasonable to expect a new judge to be called in for each consecutive ruling in a continuing dispute between two parties. In its previous ruling *In re FDR,* the Court was not required to decide whether it believed Culp's version of events to be credible, or to make any other subjective commitment which might result, or reasonably seem to result, in personal prejudice. The Court accepted Culp's version of events as true, 129 B.R. p. 656, gave Culp the benefit of the doubt despite his failure to respond to the Trustee's motion for summary judgment, 129 B.R. p. 657, and ruled on the legal and equitable consequences of the situation, 129 B.R. p. 661. If Culp was condemned in *In re FDR,* he was condemned "out of [his] own mouth," 129 B.R. p. 662. Loosely speaking, Culp might be said now to ask the Court "to reverse its previous decision." This alone is not ground for judicial disqualification—for example, a Court is asked to reverse itself every time a motion is made to reconsider or for rehearing, yet such motions are not unusual and normally do not have to be heard by a different judge, F.R.B.P. 9023,

9024, F.R.Civ.P. 59, 60. Moreover, strictly speaking, in this instance the Court is not asked to "reverse" its prior order, but to take the prior order as given and to determine its effect in the new situation of Culp's personal bankruptcy. What the Court determined in *In re FDR* was whether Culp *owed* a debt; what must be determined now is whether the debt that Culp owes is dischargeable. The Court is well aware that these are two different questions. The answer to the first question may, *as a technical matter of law*, influence the answer to the second—as the Trustee argues, and as will be discussed below. But there is no "prejudgment" in the mind of the Court. This Court is as capable as any other of determining the effect of a previous order—even though the order happens to be this Court's own. This Court knows no reason why it should disqualify itself.

■ The Trustee's motion for summary judgment invokes the doctrine of collateral estoppel.

Federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel ... Under collateral estoppel, or issue preclusion, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case, *Northern Natural Gas Co. v. Grounds*, 931 F.2d 678, 681 (10th Circ.1991).

Although the bankruptcy court in a dischargeability action under [§] 523(a) ultimately determines whether or not a debt is dischargeable, ... the doctrine of collateral estoppel may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability ... Consequently, collateral estoppel is binding on the bankruptcy court and precludes relitigation of factual issues if (1) the issue to be precluded is the same as that involved in the prior [trial court] action, (2) the issue was actually litigated by the parties in the prior action, and (3) the [prior trial] court's determination of the issue was necessary to the resulting final and valid judgment,

*In re Wallace*, 840 F.2d 762, 764–765 (10th Circ.1988); and see *In re Tsamasfyros*, 940 F.2d 605, 606–607 (10th Circ.1991). Moreover, "the fact that a bankruptcy debtor appeared *pro se* in a prior [trial] court proceeding does not lessen the collateral estoppel effect of the [prior trial] court judgment," *In re Tsamasfyros*, 940 F.2d p. 607, at least where debtor "could not complain that he was denied a full and fair opportunity to present his case or litigate the relevant issues," *id.*

In *In re FDR*, this Court found that Culp executed a note to FDR for $560,181.01; that Culp never actually borrowed that amount or received any property worth that amount from FDR; that Culp executed the note at the request of FDR's management; that FDR's management promised Culp they would not try to collect from him on the note, but would use the note merely to establish the existence of an asset valued at half a million dollars; that this bogus asset would serve to inflate FDR's "net capital ratio" in a manner that management hoped would lull and satisfy Federal regulators and inspectors; and that, notwithstanding this deception, FDR eventually failed to maintain an acceptable net capital ratio and as a result was closed down by Federal regulators. The Court found "Culp's admitted knowing participation in a scheme to mislead regulators," whose "fraudulent purpose was known to Culp at the time," 129 B.R. p. 661. The Court concluded that under such circumstances, "Culp is not permitted to raise lack of consideration or any alleged secret agreement not to collect the note as defenses to suit on the note," *id.* p. 662.

The findings were based on Culp's own admissions in his answer to a complaint, and were made in the course of ruling on a motion for summary judgment to which no response was filed but which was considered by the Court on its own merits and not merely granted in default of a response, *In re FDR*, 129 B.R. pp. 656–657. Under these circumstances, these issues were "actually litigated" in the prior action, in that Culp was given "a full and fair opportunity to present his case." All of these determinations were necessary to the

Court's final judgment in favor of the Trustee. These matters, having once been litigated and determined, shall not be re-litigated and re-determined. The question remains whether these matters, previously established in litigation over *existence* of a debt, suffice also to show *nondischargeability* of said debt.

■ The Trustee proposes, first, that Culp's debt is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), which provides that

> ... A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— ... false pretenses, a false representation, or actual fraud ...

The statute requires that (1) money, property, services, or credit, (2) must be obtained (3) by falsehood or actual fraud. Caselaw seems to have added another requirement, namely (4) "reasonable reliance." This Court must determine whether the undisputed facts in this case satisfy these requirements.

Culp argues that he "obtained" no "money, property, services, or ... credit," because his note on which the Trustee's claim is based was a bogus note, issued without actually borrowing any money or obtaining any benefit, and serving only to inflate FDR's net capital ratio in order to deceive Federal regulators. Culp is estopped from asserting that he "obtained" nothing by the note, *In re FDR*, supra; this has already been determined once and will not be litigated again; and these requirements of § 523(a)(2)(A) must be deemed to be satisfied.

■ § 523(a)(2)(A) is intended to except from discharge "only those frauds involving moral turpitude or intentional wrong, and does not extend to frauds implied in law which may arise in the absence of bad faith or immorality," *In re Black*, 787 F.2d 503, 505 (10th Circ.1986). Accordingly, "false pretenses, false representations, or actual fraud" are understood to require "a ... willful misrepresentation ... made with the intent to deceive ...," *In re Mul-*

*let*, 817 F.2d 677, 680 (10th Circ.1987). Culp issued his bogus note knowingly and deliberately. By so doing, he falsely represented the existence and face value of an asset of FDR; he knew this representation was false when he made it; he knew that this false representation would be offered to any parties inquiring about FDR's solvency or "net capital ratio"; he knew that FDR's management intended anyone making such inquiries to accept the note at (or at least near) face value; and he meant to do what he could to satisfy management's expectations. Although the initiative for the deception came from FDR's management, Culp made himself an active and willing part of it. Although his misrepresentation was indirect, it was nevertheless intended, by Culp as well as by his employers, to deceive those inquiring into FDR's net capital ratio. Under these circumstances, these requirements of § 523(a)(2)(A) are satisfied.

■ Implicit in the term "obtained" is a causal connection between the uttering of the falsehood and the rendering of money, property, etc.—that is, the creditor must *rely* on the false representation in making his decision to lend money, transfer property, or provide services or credit. See generally Prosser, *Handbook of the Law of Torts* (4th ed., Hornbook Series, 1971) Ch. 18 § 108. The notion of "reliance" as an element of "obtaining" was developed by case law under the statutory ancestors of § 523(a)(2), namely §§ 14c(3) and 17a(2) of the former Bankruptcy Act of 1898–1978 ("the Act"). Cases are many—for a partial listing, see 1A *Collier on Bankruptcy* (14th ed. 1978) ¶ 14.34 pp. 1378–1379 n. 14, § 17.16 pp. 1636–1638 n. 17. These cases fall into four groups; only a few representative examples will be cited for each group.

One group simply inquired whether a creditor actually relied on a debtor's false representations, e.g. *In re Kaplan*, 141 F. 463 (E.D.Pa.1905), *In re Jaffe*, 20 F.2d 370 (2nd Circ.1927), *International Shoe Co. v. Kahn*, 22 F.2d 131 (4th Circ.1927), *In re Hochberg*, 17 F.Supp. 916 (W.D.Penn.1936), *In re Livermore*, 96 F.2d 93 (2nd Circ. 1938), *Crue v. Timmer*, 119 F.2d 415 (6th

Circ.1941), *Eline v. Richard,* 296 Ky. 283, 176 S.W.2d 697 (1943, reh. den.1944), *In re Savarese,* 56 F.Supp. 927 (E.D.N.Y.1944), *Banks v. Siegel,* 181 F.2d 309 (4th Circ. 1950), *Rustuen v. Apro,* 40 Wash.2d 395, 243 P.2d 479 (1952), *Industrial Bank of Commerce v. Bissell,* 219 F.2d 624 (2nd Circ.1955), *In re Freeman,* 131 F.Supp. 437 (S.D.Cal.1955), *M-A-C Loan Plan, Inc. v. Crane,* 4 Conn.Cir. 29, 225 A.2d 33 (1966).

A second group noted that actual reliance is often difficult to prove directly; its existence (or nonexistence) must be inferred from various circumstances. Such cases inquired whether reliance under particular circumstances was so incredible or "unreasonable" that there could not have been any reliance at all—i.e., whether under such circumstances it could be inferred or presumed that no actual reliance had occurred. The word "reasonable" here meant "credible, plausible, might actually have happened." See e.g. *In re Reed,* 191 F. 920, 930 (W.D.Okl.1911) ("the conclusion is only reasonable that the creditor parted with the merchandise on the strength of the representation"); *In re Neuman,* 251 F. 667, 668 (D.Mon.1917) ("It is reasonable to believe ... that Neuman's statement was relied upon by his creditor, and induced in whole or in part the credit that followed it"); *Bank of Monroe of Monroe, Neb., v. Gleeson,* 9 F.2d 520, 522 (8th Circ. 1925) ("... it is difficult to conclude that a reasonable man would give a statement any weight under such circumstances and it is strong proof that no such weight was given"); *In re Sheridan,* 34 F.Supp. 286, 289 (D.N.J.1940) quoting *In re Reed,* supra; *In re Anderson,* 104 F.Supp. 599, 603, 605 (E.D.Wis.1952) ("incredible ... untrustworthy and improbable"); *Public Finance Corp. of Warren No. 5 v. Callopy,* 164 N.E.2d 205, 208 (Ravenna, Ohio Mun.Ct. 1959) ("preposterous"); *Associates Consumer Finance Co. v. Crapo,* 21 Mich.App. 195, 175 N.W.2d 315, 317 (1970) ("Common sense and ordinary procedure indicates that the [creditor's] manager was aware ... that he relied ...").

A third group ruled that reliance, *even if it actually occurred,* was to be discounted if it was not "reasonable." The word "reasonable" here meant "wise, prudent, should ideally have happened." Creditors who actually relied on false representations were denied exception from discharge, and admittedly fraudulent debtors were granted the benefit of full discharge, because in some judge's opinion such creditors should not have been so trusting. Some of these cases seem to invoke "reasonable/prudent" reliance as an element of the debt itself, or as bearing on the relative equities in imposition of a constructive trust on property of the bankruptcy estate. But some courts did allow such considerations to seep into the law of exception to discharge, *In re Lustgarten,* 289 F. 481 (2nd Circ.1923). This result was uncalled-for by the language of the bankruptcy statute, which said nothing about "reasonable" reliance (except as implied by the statutory word "obtained"). It was unjustified by the purpose of the statute, which has ever been to except from discharge "frauds involving moral turpitude," *In re Black,* supra; 3 *Collier on Bankruptcy* (15th ed. 1992) ¶ 523.08[4], [5]; 1A *Collier on Bankruptcy* (14th ed. 1978) ¶ 17.16[3], of which the most turpid frauds are surely those perpetrated on unusually trusting creditors. It was at odds with fundamental bankruptcy policy, which is to grant discharge only to " 'honest but unfortunate debtor[s],' " *Grogan v. Garner,* 498 U.S. ——, ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755, 765 (1991) quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235 (1934), not to dishonest debtors fortunate enough to have gullible creditors. And it was contrary to the usages of equity, whose general rule is that "even the foolishly credulous" deserve protection "against the machinations of the designedly wicked," 37 AM.JUR.2D (1968) "Fraud and Deceit" § 247 p. 329.

The U.S. Supreme Court directed lower courts to concentrate on the reality rather than the propriety of reliance. In *Gerdes v. Lustgarten,* 266 U.S. 321, 326, 45 S.Ct. 107, 109, 69 L.Ed. 309, 312 (1924), the Supreme Court held that, where a debtor had succeeded in misleading a creditor by inducing actual reliance upon a false statement, "it does not lie in his mouth to say that, by reason of extrinsic circumstances,

the creditor was not justified in relying upon it." The Supreme Court's directive was followed by the Court of Appeals of this Circuit, which treated reliance simply as a matter of "proximate result" or "actual ... effect ...," *Mullen v. First Nat'l Bank of Ardmore, Okl.*, 57 F.2d 711, 712, 713 (10th Circ.1932), or " 'proximate cause,' " *Wolfe v. Tri–State Insurance Co.*, 407 F.2d 16, 19 (10th Circ.1969); and see *In re Vickers*, 577 F.2d 683, 687 (10th Circ. 1978):

A fourth group of cases neglected the Supreme Court's ruling in *Gerdes v. Lustgarten*, and continued to speak of "reasonable" as distinct from "actual" reliance, though in terms that were ambiguous, confusing and perhaps confused, e.g. *In re Matera*, 436 F.Supp. 947 (E.D.Wis.1977), *In re Smith*, 424 F.Supp. 858 (M.D.La.1976), *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Circ.1971). A line of cases developed in the 7th Circuit which gave lip service to a separate requirement of "reasonableness," yet applied it in such a way that it amounted to nothing more than the usual requirement of actual reliance, *Carini v. Matera*, 592 F.2d 378 (7th Circ.1979), *In re Garman*, 643 F.2d 1252 (7th Circ.1980), cert. den. 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981).

In 1960, Act §§ 14c(3) and 17a(2) were both amended. § 14c(3), which had provided denial of discharge for debtors who "obtained" money, property or credit by means of false written financial statements, was narrowed so as to apply only to *business* debtors. § 17a(3), which had excepted from discharge debts for money, property or credit "obtained" by deceit generally, was given a new clause expressly including deceit by the use of false written financial statements. For the first time, the word "reliance" appeared in the statutory text itself—but only in the new part of § 17a(2) referring to false written financial statements. This seems to have been a mere accident of phraseology, with no intent to change current caselaw, which already required actual reliance as an element of both §§ 14c(3) and 17a(2), 1A *Collier on Bankruptcy* (14th ed. 1978) ¶¶ 14.34, 14.35, 14.36, 14.39 pp. 1395–1396 n. 9, 17.01[3.1], 17.16[1], [3] pp. 1635–1638 n. 17.

When the Bankruptcy Code ("the Code") was enacted in 1978, Act § 14c(3) was abolished; and Act § 17a(2) was replaced by Code § 523(a)(2). Like Act § 17a(2), Code § 523(a)(2) has two parts: the first part, now formally designated (A), deals with deceits generally; the second part, now formally designated (B), deals with one type of deceit in particular, the false written financial statement. Like Act § 17a(2), Code § 523(a)(2) makes no mention of reliance at all in its first part (A), but expressly mentions reliance in its second part (B). Unlike Act § 17a(2), Code § 523(a)(2)(B)(iii) expressly requires that "the creditor ... *reasonably* relied ..." Committee reports suggest that considerations of "reasonable" reliance bear on § 523(a)(2)(B) alone, H.Rep. No. 95–595 (1977) p. 364; S.Rep. No. 95–989 (1978) p. 78, U.S.Code Cong. & Admin.News 1978, 5787.

What to make of this is not clear. On the one hand, § 523(a)(2)(B)(iii) may be merely the result of the Code's mechanical adaptation of § 17a(2)'s accident of phraseology, adding nothing to the requirement of actual reliance already implicit in the statutory word "obtained," and meaning nothing different from § 523(a)(2)(A) despite the difference in wording. On the other hand, § 523(a)(2)(B)(iii) may indicate Congressional intent to require something more than "reasonable/actual" reliance, in the nature of "reasonable/prudent" reliance, for purposes of § 523(a)(2)(B) alone. The latter possibility seems at first unlikely, since it would impute to Congress an intent not only to overrule prior statutory and case law, but also to contradict basic bankruptcy policy and the norms of equity. But in 1960, Congress had noted some extreme abuses of written financial statements by creditors whose lack of scruple equalled or exceeded that of dishonest debtors, 1A *Collier on Bankruptcy* (14th ed. 1978) ¶ 14.34 pp. 1376–1377, quoting S.Rep. No. 1688, 86th Cong., 2d Sess. (1960); and such sordid practices had also been noted from time to time in caselaw, *In re Sabsevitz*, 197 F. 109 (S.D.N.Y.1912), *In re Berberich*, 190 F.2d 53 (7th Circ.1951), *In re Anderson*, supra, *Public Finance*

*Corp. of Warren No. 5 v. Callopy*, supra, *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967), *In re Dye*, 330 F.Supp. 895 (W.D.La.1971). In 1978, Congress might have felt driven to take extreme measures to remedy such abuses, by increasing the burden on creditors to show "reasonable/prudent" reliance on false written financial statements under § 523(a)(2)(B). But committee reports for § 523(a)(2)(B) mention no such innovation, and indeed declare that no change in prior case law was intended.

■ Although § 523(a)(2)(B) is puzzling, it is at least clear that the puzzle is confined to subsection (a)(2)(B). Subsection (a)(2)(A) continues to use the traditional statutory formula, which makes no mention of "reasonable reliance" but does require that money, property, services or credit be "obtained." The language of § 523(a)(2)(A) alone, in conjunction with § 523(a)(2)(B), and in comparison with former statutory provisions and case law, as well as legislative history, sound bankruptcy policy and equity, all indicate that "reasonable" reliance under § 523(a)(2)(A) should be nothing more than a means of inferring the existence (or nonexistence) of *actual* reliance under some circumstances, bearing in turn on whether anything was "obtained" by deceit.

The Court of Appeals of this Circuit has held that courts must continue to require "reasonable" reliance under § 523(a)(2)(A). In *In re Mullet*, 817 F.2d p. 679, the court stated

> We conclude that this standard of reasonableness required under § 17(a)(2) should continue to be imposed on claimed reliance pertaining to § 523(a)(2)(A).... This standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations. Of course, the reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.

Further, the 10th Circuit Court expressly declared that "the court should not, in hindsight, substitute its business judgment for that of the creditor" in determining what reliance was proper, *id.* p. 681; and the

Bankruptcy Court ruling which the 10th Circuit Court affirmed was that the creditor " 'ha[d] failed to establish that there *was any kind of reliance* ...,' " *id.* p. 678 (emphasis added). These elements of the opinion suggest that "reasonableness" should be read narrowly, as going merely to the plausible existence of actual reliance; and that language seemingly to the contrary was meant merely to reject the extreme proposition that a debtor's dishonesty alone can cause exception to discharge (even where a creditor's reliance is so "unreasonable" as to be nonexistent).

This Court reads *In re Mullet* in the way that conforms more closely to the matter actually before the Court of Appeals, prior caselaw, statutory language, legislative history, bankruptcy policy, and equity in general. It follows that § 523(a)(2)(A) does require "reasonable" reliance, but "reasonable" here means only such reliance as is credible, and goes to the existence of actual reliance by the particular creditor and not to some judge-made standard of prudent or businesslike reliance.

■ In its previous ruling *In re FDR*, this Court did not find that any particular person or governmental agency had actually relied on Culp's bogus note. Indeed, the Court noted that " '[r]eliance' ... in the traditional sense may be difficult to demonstrate" in circumstances such as those before the Court; and adopted a formulation of the *D'Oench, Duhme* doctrine "in which serious violation or subversion of a statutory regulatory scheme takes the place of traditional reliance ... as an indicator that something is genuinely amiss ...," *In re FDR*, 129 B.R. p. 660. Since Culp is estopped to deny that he "obtained" money by the note, it follows that Culp is also estopped to deny "reasonable/actual" reliance on his conduct. Any other ruling would allow a fraudulent debtor to escape the consequences of his fraud, and do an injury to FDR's creditors, to the securities regulation process, and indirectly to future investors. Courts of equity are generally supposed to avoid overly rigid and narrow definitions of "fraud," so that equity jurisprudence may adequately respond to "the

fertility of man's invention in devising new schemes of fraud," 37 AM.JUR.2D (1968) "Fraud and Deceit" § 1 p. 18. This Court is "not keen to discover technical grounds upon which a bankrupt may escape the consequences of wrongful acts," *In re Sabsevitz*, supra, 197 F. p. 111; and does not readily impute to Congress an intention to use bankruptcy law to create "a sanctuary for liars," *In re Pincus*, 147 F. 621 (S.D.N.Y.1906).

Under these circumstances, this final requirement of § 523(a)(2)(A) must be deemed to be satisfied.

The word "injury" raises another issue.

■ The Trustee proposes, second, that Culp's debt is excepted from discharge under 11 U.S.C. § 523(a)(6), which provides that

... A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ... (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

The statute requires (1) willful and (2) malicious (3) injury to another entity or to property.

What is "willful and malicious" for purposes of the bankruptcy statute is a matter of Federal bankruptcy law, *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). The interpretation and application of the terms "willful and malicious" has been the occasion of some inconsistency and confusion in the Federal courts—compare *In re Franklin First National Bank of Albuquerque v. Franklin*, 726 F.2d 606 (10th Circ.1984) holding that professional malpractice amounting to gross negligence was "willful and malicious" under § 523(a)(6) with *In re Compos Farmers Insurance Group v. Compos*, 768 F.2d 1155 (10th Circ.1985) holding that drunk driving amounting to recklessness was not "willful and malicious" under § 523(a)(6); and see Aubry, "Malice in Wonderland—the Meanings of Willful and Malicious in § 523(a)(6)" in *Norton Bankruptcy Law Adviser*, No. 8 (August 1987). Recently the Court of Appeals of this Circuit appears to have settled on the following interpretation of "willful and malicious" for purposes of § 523(a)(6):

The "willful" element ... simply addresses whether the debtor intentionally performed the basic act complained of ... "Willful" conduct is conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct ... Thus, acts caused by the debtor's negligence or recklessness are not encompassed by this exception ...

. . . . .

... [T]he focus of the "malicious" inquiry is on the debtor's actual knowledge or reasonable foreseeability that his conduct will result in injury to the creditor ...

Under § 523(a)(6), the debtor's malicious intent can be shown in two ways. In the rare instances in which there is direct evidence that the debtor's conduct was taken with the specific intent to harm the creditor, the malice requirement is easily established ... More commonly, however, malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, [the debtor] proceeded to take action in violation of those rights ...

... [T]he court correctly looked to whether the [debtors] had willfully disregarded the rights of [the creditor] ...,

*In re Posta*, 866 F.2d 364, 367–368 (10th Circ.1989).

... Under § 523(a)(6), maliciousness is established if the debtor possesses actual knowledge, or if it is reasonably foreseeable, that his conduct will result in injury to the creditor ...,

*In re Grey*, 902 F.2d 1479, 1481 (10th Circ. 1990) citing *In re Posta*, supra.

■ Culp's execution of the false note was intentional and deliberate, with knowledge of the note's falsity. Hence Culp's act was "willful." Culp knew when he executed the note that it would be offered to regulators to deceive them as to FDR's actual net capital ratio, and as a result to enable FDR to continue its irregular operations longer than the law allowed. These

illegal consequences were not only reasonably foreseeable, they were specifically intended. Hence Culp's act was "malicious."

Culp says he acted in mere "ignorance and stupidity," response p. 5 ¶ 10. No doubt Culp was ignorant of the consequences *to himself* of his act; and he may have stupidly done what others refused to do. But he knew what he was doing, and what consequences *to others* were expected to follow from his act. This is not mere ignorance or lapse of judgment; this is willful malice.

There has certainly been an "injury"—to FDR's regulators, to SIPC, to FDR's customers, to the securities regulation process and therefore indirectly to future investors. Culp has injured, not just one adverse party, but an entire system. The very enormity of such an injury makes it difficult to quantify.

■ The dischargeability of a debt and the measure of damages for the underlying offense are separate and distinct questions, *In re Gerlach*, 897 F.2d 1048, 1051 (10th Circ.1990). The nondischargeable "damages" may exceed the actual harm suffered by the creditor, *id.; In re Manley*, 135 B.R. 137 (B.C., N.D.Okl.1992).

■ In these unusual circumstances, wherein the "debt" is established by the *D'Oench, Duhme* doctrine, the basic measure of "damages" for Culp's fraudulent injury to the clients, regulators, insurers and successors of FDR is the face amount of the bogus note. Cases such as *In re Modicue*, 926 F.2d 452 (5th Circ.1991) are distinguishable, in that they deal with conventional torts whose damages may be readily ascertained independently of any contract, not with "regulatory torts" of the *D'Oench, Duhme* type which are established by estoppel on a note and have no readily ascertainable measure of damages apart from the note.

Since the note itself provides for prejudgment interest and attorney fees, those amounts must be included among damages as measured by the note.

The Trustee makes no argument regarding inclusion of the $120 court costs in the non-dischargeable debt.

Accordingly, the Trustee's "Motion for Summary Judgment" is hereby granted, except as to the $120 in court costs. Judgment shall be entered determining Culp's debt to the Trustee to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A), (6) in the amount of $735,663.25. The Trustee shall prepare and submit an appropriate form of judgment.

AND IT IS SO ORDERED.