In re Charles CLAXTON a/k/a Randy Claxton and Crystal Claxton p/k/a Crystal Lavon Dossman, Debtors.

Charles CLAXTON and Crystal Lavon Claxton, Plaintiffs,

v.

STUDENT LOAN MARKETING ASSOCIATION and Higher Education Assistance Foundation, Defendants.

Bankruptcy No. 91-02124-W.

Adv. No. 91-0217-W.

United States Bankruptcy Court, N.D. Oklahoma.

May 19, 1992.

Ty H. Stites, Tulsa, Okl., for plaintiffs.

Mac D. Finlayson, Flowers, Harman, Hack & Finlayson, Tulsa, Okl., for defendants.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

This adversary proceeding was submitted for decision upon stipulations and briefs. Upon consideration thereof, and of the record herein and in the above-styled case under 11 U.S.C. Chapter 13, the Court, pursuant to F.R.B.P. 7052 and 9014, finds, concludes, and orders as follows.

## FINDINGS OF FACT

Charles Claxton and Crystal Claxton ("Mr. Claxton;" "Mrs. Claxton;" "debtors") are husband and wife. They have two minor dependent children, now aged six and three. Neither parents nor children suffer from any physical, medical or mental disability. Mr. and Mrs. Claxton have high school educations, save as noted below.

On or about April 17, 1989, Mr. Claxton borrowed some $6,625 from Bank IV, N.A. ("the Bank"). Mr. Claxton gave the Bank two promissory notes: one in the original principal amount of $4,000 at variable interest, to be repaid in 113 consecutive monthly installments of $67.34 each beginning on June 4, 1991; the other in the original principal amount of $2,625 at interest increasing from 8% to 10%, to be repaid in 61 consecutive monthly installments of $50 each beginning on June 23, 1991, and a final installment of $42.81. Mr. Claxton borrowed the money and executed these notes "in anticipation of attending Tulsa Welding School, in Tulsa, Oklahoma, from June 6, 1989, to September 26, 1989, as a full-time student," stips. ¶ 16 p. 4. The notes were signed by Mr. Claxton alone. "The proceeds ... were used by [Mr. and Mrs. Claxton] to pay the costs of his tuition [and] equipment associated therewith, and to support themselves and their dependents ... during that period," id.

The notes were guaranteed by Higher Education Assistance Foundation ("HEAF"), "a Minnesota ... corporation ... [and] nonprofit guaranty agency under the Guaranteed Student Loan Program ... established by the Higher Education Act of 1965" codified at 20 U.S.C. § 1071 ff., stips. ¶ 5 p. 2. "[T]he [n]otes were endorsed and assigned to HEAF and HEAF is the owner and holder of the claims for such student loans," stips. ¶ 14 p. 4. The notes "provide for the payment of HEAF's reasonable attorney fees and costs of collection in the event of default," stips. ¶ 8 p. 3.

Mr. Claxton "made payments totalling $500.00, but otherwise defaulted in his obligation to repay the ... [n]otes according to their terms, which defaults are continuing," stips. ¶ 12 p. 4. Deferment or special payment arrangements may be available to debtors who cannot meet the original repayment terms of their educational loans— see HEAF's brief pp. 4, 21, uncontested by debtors' brief. Mr. Claxton "made no attempt to modify the terms of the ... [n]otes or their repayment," stips. ¶ 24 p. 5.

From December 1989 to August 1990, Mr. Claxton was employed as a welder for Vulcan Boiler at a wage of $10.20 per hour, earning net monthly income of $1,320.00. Mr. and Mrs. Claxton received food stamps from September 1990 through July 1991. In June 1991, Mr. Claxton obtained temporary employment as a "material handler" for Memorex–Telex, earning take-home pay variously stated at $776 to $950 per month. Mrs. Claxton is unemployed and receives $233 per month child support.

On June 20, 1991, Mr. and Mrs. Claxton filed their joint voluntary petition for relief under 11 U.S.C. Chapter 13 ("Ch. 13") in this Court. They reported no recent or pending executions, foreclosures or repossessions. They reported no priority or tax debts; debts totalling $12,942.84 secured by collateral valued at $8,708; and non-priority unsecured debts totalling $10,-204.90, of which $5,717.81 was owing on "educational loan[s]," and the balance on credit cards, unspecified "legal services," utility bills, one small insider loan and one small medical bill. Debtors also reported income of $950 per month wages to Mr. Claxton and $233 per month child support to Mrs. Claxton, and expenses of $981 per month, for an excess of income over expenses of $202 per month. Debtors proposed to pay $200 per month under their Ch. 13 plan.

From July 1991 to the present, Mr. Claxton has been employed as a "material handler" for Total Value Systems at a wage of $5.50 per hour, earning net income of $776 per month.

On July 10, 1991, debtors filed their "Chapter 13 Plan ...," which proposed plan payments of $250 per month. On July 25, 1991, debtors filed their "First Modified Chapter 13 Plan ...," which proposed plan payments of $175 per month for 60 months. Most of the plan payments would go to pay secured claims; only 3% of unsecured claims would be repaid. Debtors propose to include the debts for educational loans among general unsecured claims, and to discharge the unpaid 97% of such debts under 11 U.S.C. § 523(a)(8)(B), § 1328(a)(2).

On August 7, 1991, debtors filed their complaint commencing this adversary proceeding to determine dischargeability of

these educational loans. HEAF is agreed to be "the true defending party in interest herein," stips. ¶ 5 p. 2. On September 6, 1991, HEAF answered debtors' complaint; and counterclaimed for judgment on the notes for the unpaid principal and interest in the total amount of $7,356.75 as of August 30, 1991, plus costs and attorney fees in an unspecified amount, and for determination that such debts are not dischargeable. On September 24, 1991, debtors replied to the counterclaim, admitting most of its allegations of fact, but denying that interest continues to accrue on the unpaid debt and asserting "that any attorney's fees are dischargeable," reply ¶ 5.

On February 12, 1992, the parties filed their "Joint Stipulations" herein. On March 12, 1992, HEAF filed its "Trial Brief ...;" and on March 13, 1992, debtors filed their "... Trial Brief ..." Thereafter, the Court took the matter under advisement.

Any "Conclusions of Law" which ought more properly to be "Findings of Fact" are adopted and incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), 11 U.S.C. § 523(a)(8), § 1328(a)(2).

11 U.S.C. § 1328(a)(2) provides that a discharge in Ch. 13 does not discharge "any debt ... of the kind specified in paragraph ... (8) of section 523(a) ... of this title ..." In turn, § 523(a)(8) provides in pertinent part that

... A discharge ... does not discharge an individual debtor from any debt ... for an educational ... loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repay-

ment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor or the debtor's dependents ...

It appears indisputable that Mr. Claxton is liable on these notes. On the other hand, there is neither evidence nor argument that Mrs. Claxton owes any "debt" whatsoever on these notes or for their proceeds or any part thereof. The dispute is whether Mr. Claxton's debt on these notes is dischargeable. The parties stipulate that the notes "evidence student loans made, insured or guaranteed by a governmental unit within the contemplation of [11 U.S.C. § 523(a)(8) ]," stips. ¶ 13 p. 4; and that the notes "first became due (exclusive of any applicable suspension of repayment) less than seven (7) years before the commencement of Debtors' bankruptcy case herein," stips. ¶ 11 p. 4. Therefore, Mr. Claxton's debt on these notes is excepted from discharge, "unless ... excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents" under § 523(a)(8)(B).

HEAF's collection efforts are stayed for the duration of the plan, 11 U.S.C. § 362(c)(2)(C), § 1328(a). "HEAF stipulates it is bound by the payment terms of the Plan for the duration of the Plan period to the entry of Debtors' discharge herein, and ... would only then be able to enforce such claim or otherwise compel repayment under the terms of the [notes]," stips. ¶ 28 p. 6. Meanwhile, partial payment of HEAF's debt by means of a confirmed Ch. 13 plan cannot be said to inflict an "undue hardship" on debtors; for debtors' plan could not be confirmed if it left debtors insufficient income to meet necessary expenses, 11 U.S.C. § 1325(b). Therefore, HEAF's debt could not begin to impose any "undue hardship" on debtors until after their Ch. 13 plan has been completed and HEAF's efforts to collect the unpaid balance of its debt are no longer stayed. HEAF argues that, when the plan has been completed, debtors will have at least $175 per month (the amount of the former plan payments) of income which is not necessary

to meet living expenses and can then be used to pay the balance of HEAF's debt; so that "at the conclusion of the Plan there will be sufficient funds to repay the ... [n]otes by their combined repayment terms of $107.34 per month, with $67.66 in excess funds available monthly to the Debtors for other uses," stips. ¶ 31 p. 7. Debtors "dispute this position," *id.*, but offer no facts or figures to the contrary. Debtors do argue that this Court should not determine "undue hardship" according to circumstances at completion of the Ch. 13 plan, but rather according to circumstances at inception of the Ch. 13 case; and that debtors could not afford to repay HEAF's debt as of that time.

The parties agree that debtors have the burden of proving undue hardship. But the Bankruptcy Code does not define "undue hardship;" and it is not clear exactly what it is that debtors must prove. Case law has developed at least four different "tests" for discovering undue hardship.

First, *In re Johnson*, 5 B.C.D. 532 (B.C., E.D.Pa.1979), a case under the former Bankruptcy Act, set forth an elaborate three-part test which has been followed in many cases under the present Bankruptcy Code. This complex test requires a debtor to justify discharge of the debt in light of his financial history, resources and prospects, his behavior in bankruptcy, and policy considerations of the student loan program.

Second, some courts, while ostensibly following *In re Johnson*, supra, have emphasized that the statute requires not only hardship but "undue" hardship. These courts "presume" that student loans are excepted from discharge even when debtors are in "severe financial difficulties," and require proof of "truly severe and even uniquely difficult circumstances" to rebut such presumption, *In re Craig*, 64 B.R. 854, 857 (B.C., W.D.Pa.1986).

Third, *In re Bryant*, 72 B.R. 913 (B.C., E.D.Pa.1987), reacting against the complexity of the *Johnson* formula and the severity of the "uniquely difficult circumstances" rule, held that undue hardship would be presumed if debtor's income was "at or near" the Federal Poverty Income Guidelines established by the Department of Health and Human Services; but undue hardship might also be found at higher income levels under "unique and extraordinary circumstances."

Fourth, some courts have refused rigid adherence to any particular "test." This Court is among them. In *In re Johnson*, 121 B.R. 91 (B.C., N.D.Okl.1990), this Court, per Covey, J., noted that " '[u]ndue hardship' means more than having a tight budget or a present inability to pay, because most debtors could make such assertions;" but with this in mind, looked to "the totality of circumstances involved" in order to "manage the equities of each case [in] view of the legislative intent [and] policies of the Bankruptcy Code and the ... student loan program," *id.* p. 93. The Court held that "tests" used and factors considered in other cases were relevant and might be persuasive, but should not be mechanically applied; the overriding factor is a well-informed judicial "discretion," so employed that "[a] case ... succeeds or fails on its own merits and particular circumstances," *id.* This approach resembles the second "test" above, but is not so rigid and severe; it does not "presume," but merely weighs.

█ No reason appears why this Court should depart from its own precedent. Therefore, this Court will except this educational loan from discharge, unless debtors can show something more than "a tight budget or a present inability to pay;" but this "something more" cannot be reduced to rigid rule or simple formula, but depends on "the totality of circumstances involved" in light of Congressional intent and policies in administering *both* bankruptcy relief and the student loan program.

█ Debtors argue, in effect, that if they can't pay right now they can't ever pay at all; but this Court rejects such argument. "The totality of circumstances" includes both circumstances at commencement of the case and circumstances thereafter. Designating any particular "time" for determination of undue hardship as a matter of law is unrealistic and must dis-

regard some relevant circumstances. In this instance, the only meaningful, realistic question before the Court is whether excepting HEAF's debt from discharge will cause an undue hardship to debtors *after* conclusion of their Ch. 13 plan. This question cannot be answered without taking debtors' future prospects into account.

The Court is mindful of bankruptcy's objective of providing the honest but unfortunate debtor with a fresh start, *Grogan v. Garner*, 498 U.S. ——, ——, 111 S.Ct. 654, 660, 112 L.Ed.2d 755, 765 (1991) quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235 (1934). However, this objective does not always override all other objectives of public administration. As HEAF points out, some twenty years ago "[t]he high default rate and discharge of student loans through bankruptcy filings began to tarnish the [educational loan] program's public image and financial viability," HEAF's brief p. 6. In response, Congress has enacted a series of laws providing for and gradually extending nondischargeability of educational loans, culminating in the Student Loan Default Prevention Initiative Act of 1990 which enacted the present text of 11 U.S.C. § 1328(a)(2). Thus, Congress has made it clear that preservation of the student loan program is itself an important objective. In Ch. 13, this objective is important enough to cause Congress to give debts for educational loans more protection even than debts for intentional tort—see 11 U.S.C. § 1328(a); compare 11 U.S.C. § 1328(b), (c), § 523(a)(2), (4), (6). This is a court of equity; but equity must take legislative policy into account. The extraordinary importance placed by Congress on repayment of educational loans impels this Court to place a heavy burden on debtors who would have such loans discharged.

■ According to HEAF, the Federal Poverty Income Guideline for 1992 for a household of four is $13,950, HEAF's brief p. 15 citing 57 Fed.Reg. 5455–02 (February 14, 1992). Debtors' present annual income is only $9,312 salary plus $2,796 child support, i.e. $12,108 total. However, debtors themselves claim to have sufficient disposa-

ble income to support a Ch. 13 plan. One of the most troublesome aspects of Ch. 13 arises when a debtor proposes a Ch. 13 plan which would repay only a tiny fraction of creditors' claims, *In re Jernigan*, 130 B.R. 879, 892–893 (B.C., N.D.Okl.1991). Here, debtors propose to use Ch. 13, which is supposed to help them pay their debts and restore normal financial relations, *id.* pp. 889–894, to avoid payment of 97% of their unsecured debt. This extremely low percentage payback is due to debtors' own officially-recognized poverty, which leaves relatively little disposable income for contribution to debtors' plan. Yet Ch. 13 itself should not constitute an undue hardship for poverty-stricken debtors. It appears to this Court that, if debtors' official poverty does not prevent them from proposing and maintaining a Ch. 13 plan, then it need not prevent them from paying HEAF's debt afterward. *In re Bryant's* poverty-guideline test is suggestive but not conclusive, especially where debtors claim to be able to carry out a Ch. 13 plan despite their official poverty. Debtors must show more than this to establish undue hardship.

In this instance, debtors show, at most, present inability to pay HEAF's debt together with debtors' other accumulated obligations. Even this is questionable—for despite their many obligations, debtors were not garnished or otherwise threatened by any of their creditors; debtors made no effort to modify the payment terms of the debt to HEAF, and indeed filed bankruptcy before one of the notes had even come due. There is no showing of other circumstances which would turn mere present inability to pay into an undue hardship—indeed, as noted above, debtors are presently protected from undue hardship by their own pending Ch. 13 case.

There is no showing of future inability to pay. When debtors' Ch. 13 terminates, their protection from creditors' collection efforts will end; but debtors' other financial obligations will meanwhile have been reduced. As noted above, debtors have never made any attempt to modify the payment terms of the debt to HEAF; yet such an attempt, if successful, might reduce debtors' monthly expenses and alleviate

any hardship. Even if the payment terms of HEAF's notes remain unmodified, debtors appear capable of repaying HEAF's debt. Debtors "dispute" but do not refute HEAF's demonstration that, after receiving their Ch. 13 discharge, debtors will be able to resume payments on HEAF's notes with some income left over for debtors' own use. Debtors' future excess income will be only $67 per month; but "a tight budget" does not constitute undue hardship, either. Debtors' future income may decrease, but it may just as well increase; such speculations unsupported by evidence "show" nothing one way or the other. Mr. Claxton is not presently working as a welder, and so does not presently appear to be enjoying the benefits of his student loan; but debtors make no showing that the loan was useless or that welding jobs are not to be expected in future. Debtors' long-continued liability on a debt which they can repay with some difficulty may be a hardship, but nothing appears to make this hardship "undue."

Debtors argue that "[i]t would defeat the 'fresh start' goal of the [Bankruptcy] Code to have the education loan claim of HEAF waiting for these Debtors after five long years of contributing *all* of their disposable income to their Chapter 13 plan," debtors' brief p. 4. This Court agrees. But where the "fresh start" policy collides with the policy of maintaining the educational loan program, Congress has declared that the "fresh start" must yield to some extent. These debtors are not just repaying their own debt to HEAF; they are helping to make education available for others in the future. This, says Congress, is worth some hardship.

The Court concludes that debtors have not met their burden of showing that, under the circumstances, exception of HEAF's debts from discharge would impose an undue hardship on debtors.

Debtors argue that, "[w]ith respect to the Counterclaim of HEAF ... this court does not have the jurisdiction to enter a money judgment against the Debtors for the educational loan claim of HEAF." No authority is cited in support of this proposition. HEAF's counterclaim for money judgment "arises in" a case (or rather in an adversary proceeding commenced in a case) under Title 11 U.S.C., and in any event is "related to" a case under Title 11 U.S.C.; hence it is within bankruptcy subject matter jurisdiction under 28 U.S.C. § 1334(b). It has been properly referred to this Court pursuant to 28 U.S.C. § 157(a). It has been admitted by debtors to be a core proceeding in its own right, see HEAF's counterclaim ¶ 2, debtors' reply to counterclaim ¶ 2. Debtors' argument that such a counterclaim is beyond the jurisdiction of this Court is without merit.

In their pleadings and stipulations, the parties agree that a total of $7,356.75 unpaid principal and accrued interest was due and owing as of August 30, 1991. Debtors deny that interest continued to accrue thereafter; but the parties supply no information or argument as to the availability or rate of interest thereafter. This Court limits its judgment for principal and accrued interest to the agreed amount of $7,356.75.

■ In their pleadings, the parties contest dischargeability of attorney fees and costs; but in their briefs, they do not argue this issue. This Court has previously permitted attorney fees and other marginal types of damages or costs to be included in nondischargeable debt under 11 U.S.C. § 523(a)(4), (5) and (6), based on a combination of statutory language, precedent cases and policy factors, *In re Manley*, 135 B.R. 137 (B.C., N.D.Okl.1992); *In re Poe*, 118 B.R. 809 (B.C., N.D.Okl.1990); *In re Orrick*, 51 B.R. 92 (B.C., N.D.Okl.1985). The Court is reluctant to add to debtors' burdens in cases such as this; but attorney fees and collection costs are real costs, and the Court is also reluctant to bleed the educational loan program. Absent any contrary argument by debtors, the Court holds that, for purposes of 11 U.S.C. § 523(a)(8), where attorney fees and costs are expressly provided for together with the principal obligation in the notes which establish the debt, and such provision is enforceable absent bankruptcy, and such fees and costs were actually and reasonably incurred in collection or enforcement

of such principal obligation, such attorney fees and costs will also be excepted from discharge.

Therefore, HEAF is awarded $7,356.75 as of August 30, 1991, plus attorney fees and costs actually and reasonably incurred, against Charles Claxton only and not against Crystal Lavon Claxton; and all such sums are excepted from discharge under 11 U.S.C. § 523(a)(8)(B), § 1328(a)(2), as to Charles Claxton only and not as to Crystal Lavon Claxton. Judgment shall issue accordingly. HEAF shall prepare an appropriate form of judgment, which shall be approved as to form by debtors, and submit the same to this Court. However, execution on said judgment is stayed pending disposition of debtors' proposed Ch. 13 plan.

AND IT IS SO ORDERED.