In re Richard L. GORANSON and
Carole E. Goranson, Debtors.

Carole E. GORANSON, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY, Defendant.

Bankruptcy No. 91–13580 K.
Adv. No. 94–1169 K.

United States Bankruptcy Court,
W.D. New York.

May 26, 1995.

Kenneth R. Hiller, Jeffrey Freedman, Buffalo, NY, for plaintiff.

K. Kevin Murphy, Staff Counsel to PHEAA, Harrisburg, PA, for defendant.

## DECISION AFTER TRIAL

MICHAEL J. KAPLAN, Chief Judge.

This adversary proceeding was initiated by the Debtor, Carole Goranson, in an effort to have her student loan indebtedness declared dischargeable as an undue hardship under 11 U.S.C. § 523(a)(8). The difficulty in this case arises in trying to apply traditional "hardship" analysis to a Chapter 13 case. The Court today rules that a debtor should neither be penalized nor aided by the fact that some of her payments are being made through a Chapter 13 Trustee. Proper hardship analysis requires reference to the Chapter 7 analogue to the present Chapter 13 circumstances of the debtor. In this case, judgment for the Debtor is commanded by that analogue, together with an application of the appropriate tests thereto.[1]

### *Facts*

Most of the pertinent facts in this case have been stipulated by the parties. Plaintiff–Debtor received a bachelor's degree in English Literature from Canisius College in Buffalo, New York, in 1986. In 1986 and 1987, she attended the State University of New York at Buffalo in hopes of obtaining a master's degree, but for reasons not in evidence she did not complete the program. In order to meet her educational expenses from 1982 through 1987, Debtor took out student loans guaranteed by the Pennsylvania Higher Education Assistance Agency ("PHEAA"). At the time of trial, Debtor owed over $23,-

---

1. The present Court respectfully disagrees with the decision in *In re Raisor*, 180 B.R. 163 (Bankr. E.D.Tex.1995), which holds that a student loan hardship case is not ripe for adjudication in a Chapter 13 case until near or at the time of completion of the Chapter 13 plan. That court's reasoning is echoed in the arguments of the Defendant in this case and will be addressed herein. Beyond that, it need only be noted that the *Raisor* court admits of a practice of ordering "imaginative repayment terms based on the financial condition of the debtor to ensure that congressional intent is not frustrated." *Raisor*, 180 B.R. at 167. The perceived need to wait until the completion of the plan is understandable where the mandate of § 523(a)(8) has been so interpreted. The present Court has thusfar not agreed that § 523(a)(8) may be read as if it stated that student loans are to be discharged "to the extent" that they are an undue hardship, and to be nondischargeable "to the extent" that undue hardship is not proven.

000 to PHEAA as a result of those student loans. From 1988 until 1991, Debtor made de minimus payments and obtained several deferments of her repayment obligation. Although PHEAA is stayed by the pendency of the Chapter 13 case from collecting its debt, interest continues to accrue on any non-dischargeable student loan debt. The regular payment on that debt would be approximately $175 per month on a ten year schedule.

At trial, Plaintiff testified that after leaving school, she applied for numerous jobs at libraries and bookstores, but was only offered part-time jobs. She testified that most such employers preferred applicants with a degree in library science and higher degrees than a bachelor's degree. Since 1985, she has worked sporadically at minimum wage jobs, and currently works approximately twenty hours per week as a page at the Buffalo and Erie County Public Library. In addition, Debtor has gained some part-time employment at a local retail store during the Christmas season. In October, 1991, Plaintiff filed a Chapter 13 bankruptcy petition.

Plaintiff and her husband have two sons, ages three and five. The older one is in school during the day, but the younger one is still at home. Plaintiff stays home to care for the three year old while her husband is at work, as the family doctor advised that the child not be put in day care due to a fragile physical condition resulting from his being born three months premature. He will, however, be starting a school program in the autumn. Mr. Goranson works from 4:00 p.m. until 12:00 a.m. as a customs broker's clearing agent, so Plaintiff is currently only able to work in the morning or early afternoon.

According to tax returns filed by the Debtors from 1991 through 1993, the adjusted gross income for their household ranged from approximately $12,500 to slightly more than $15,000. In each of those years, the Debtors also received a tax refund in the $1,500 to $2,000 range.

At trial, Debtor testified that their household monthly budget is approximately as follows:

| | |
|---|---|
| Rent | $452.00 |
| Telephone | 100.00 |
| Food | 150.00 |
| Clothing | 40.00 |
| Transportation | 80.00 |
| Recreation | 50.00 |
| Auto Insurance | 45.00 |
| Miscellaneous | 10.00 |
| | $927.00 |

In addition, the Goransons make Chapter 13 Plan payments of $216.00 per month, under a 60-month plan that will pay only 5% to unsecured creditors.

### Discussion

■ In order to prove that a student loan is an "undue hardship" within the meaning of § 523(a)(8), a debtor must satisfy the following criteria, as enunciated by the Second Circuit in *Brunner v. New York State Higher Education Services Corporation*, 831 F.2d 395, 396 (2d Cir.1987):

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

It should be noted, however, that the *Brunner* decision was rendered before § 1328(a)(2) was amended (on November 5, 1990) to specifically except education loans from discharge in a Chapter 13 case, other than as provided in § 523(a)(8). It is unclear, therefore, exactly how the Second Circuit would intend that its *Brunner* test should be applied in a Chapter 13 case.

■ Counsel for PHEAA argues here that because Debtor and her husband are successfully making payments into their Chapter 13 Plan, which will end in the fall of 1996, she must fail the first prong of the *Brunner* test. In support of this argument, PHEAA points to *Claxton v. Student Loan Marketing Association (In re Claxton)*, 140 B.R. 565 (Bankr.N.D.Okla.1992). In *Claxton*, the husband and wife Chapter 13 debtors' income placed them below the official poverty line. Although that alone seems to imply that hav-

ing to repay a student loan would be an undue hardship, the *Claxton* court found that because the debtors were capable of making their monthly payments under their Chapter 13 plan, they must be able to contribute that same amount each month toward the student loan once their obligation to make plan payments terminated. "[D]ebtors themselves claim to have sufficient disposable income to support a Ch. 13 plan. . . . It appears to this Court that, if debtors' official poverty does not prevent them from proposing and maintaining a Ch. 13 plan, then it need not prevent them from paying HEAF's debt afterward." *Claxton,* 140 B.R. at 569.

The *Claxton* court's belief that the termination of a Chapter 13 plan necessarily frees up income which a debtor could use to repay student loans implies that a debtor who successfully completes a Chapter 13 plan can never prove that he or she would not be able to maintain a minimum standard of living if forced to repay the student loan, so long as the plan payment approximates the student loan payment in size. At least in the Second Circuit, where the *Brunner* test is the operative standard for student loan dischargeability cases, use of the *Claxton* analysis would suggest that a Chapter 13 debtor who is successfully completing such a plan could never meet the first prong of the *Brunner* test, and therefore could never have a student loan discharged. With due respect to the *Claxton* court, the conclusion that because a debtor can presently afford to make monthly payments into a Chapter 13 plan, he or she can and should continue to make such payments indefinitely, is based on faulty assumptions and is inharmonious with many of the policy considerations at work in the Bankruptcy Code.

First, the *Claxton* argument is at odds with the policy of limiting Chapter 13 plans to no more than five years in duration. *See* 11 U.S.C. § 1322(d). If one can pay $216 per month for five years, then surely one can pay

something approximating that amount for ten years, PHEAA's argument goes. Congress, however, has clearly limited the duration of Chapter 13 plans to five years. Without a duration limit, a worthy debtor might ask, "When does my 'fresh start' start?"[2] PHEAA would have the Court apply *Claxton* such that the election to attempt to repay debts in whole or in part by way of Chapter 13 inures to a debtor's detriment. Unlike Chapter 7 debtors, Chapter 13 debtors with student loans would be effectively penalized for having already proved a stream of income that is supposedly "disposable."

Additionally, in some cases a debtor may have voluntarily proposed a Chapter 13 plan which causes him or her to live below the "minimum standard of living" described in the *Brunner* test for the duration of the plan in order to save their residence, or their vehicle, or to pay tax arrears. "Feasible" does not mean "achievable without sacrifice." Some Chapter 13 debtors endure a standard of living lower even than that contemplated by *Brunner;* that they manage to do so proves nothing for *Brunner* purposes.

Finally, the assumption that debtors can continue to keep making plan payments after the plan expires is too simplistic. Although the termination of the plan will free up that amount of money each month, the debtors may have additional expenses and obligations arising at that time. In fact, the debtors may have even foreseen at the time of confirmation that they could afford to pay a particular monthly payment for up to three or five years, but not forever. Cars wear out. As children grow and parents can work more, so also grow clothing and food costs, transportation costs, day care costs, etc.

As noted elsewhere by this Court, the difficulty of the statute and of the second prong of the *Brunner* test is its linking of "undue hardship" with an effort by the Court

---

**2.** In *In re Kraft,* 161 B.R. 82 (Bankr.W.D.N.Y. 1993), this Court cautioned Chapter 7 debtors seeking to establish an "undue hardship" discharge to select the "snapshot date" at which they initiate the adversary proceeding wisely in light of the "post-discharge future." In Chapter 13 cases, the protection of the automatic stay extends for the life of the plan, although dis-

charge does not enter until the plan is completed. The long-lived stay in Chapter 13 cases provides relief from past obligations that is similar to the relief that discharge provides in Chapter 7 cases. Consequently, the Chapter 13 counterpart to the *Kraft* caveat would be for debtors to give appropriate consideration to life under the protection of the Court.

to predict the future. *See In re Kraft*, 161 B.R. at 86. That task is challenging enough in a Chapter 7 case, in which the future is tomorrow, but PHEAA asks that the Court read the future that follows completion of the plan.

■ On the other hand, it is important to note that this is the Debtor's Complaint, not PHEAA's. The Debtor has chosen the date of the "snapshot" which the Court must examine for *Brunner* purposes. While the Court today holds that proposal of, or a successful completion of, a Chapter 13 Plan proves nothing at all for *Brunner* test purposes (except, perhaps "good faith," as described below), the fact that the debtor enjoys the benefit of the automatic stay for three to five years, and therefore may select any snapshot date during or after that time as the date on which to prove "undue hardship," does offer a feature not available in a Chapter 7—the possibility of a budgetary "track record."

Although that record might be more developed toward the end of the Chapter 13 than at the beginning, at least there is still the scrutiny of the Chapter 13 Trustee and the Court (and sometimes other creditors) at the time of confirmation to reinforce a debtor's claimed costs of living.

It is a large window of time that the debtors have in which to select the snapshot date. Today's holding as to PHEAA's arguments is that the challenge to the Court at the debtor's chosen point in a Chapter 13 case under the *Brunner* test is to formulate the Chapter 7 analogue to whatever is occurring in the Chapter 13 case. To do otherwise would be to penalize a debtor for electing Chapter 13 over Chapter 7.

In *Claxton*, as here, the monthly payments being made to the Chapter 13 Trustee were (at the time of inquiry) principally car payments,[3] and yet the *Claxton* Court inexplicably considered such payments to be "projected disposable income." If the present case were a Chapter 7 case, the Debtors would be paying their car loan directly, rather than through the Chapter 13 Trustee, and even PHEAA would not likely deny the debtors the very same $156.75 to preserve the same means of transportation that PHEAA suggests is a "disposable" expense in Chapter 13.

In sum, these Debtors' Plan is not driven by the projected disposable income test. It is driven by the amount needed to save the 1989 Dodge Colt and certain ordinary household goods. If the Debtors could pay for these outside the Plan[4] and propose a plan driven only by projected disposable income, the amount paid to unsecured creditors would be minimal. In a Chapter 7, it would be clear that these Debtors are living near the poverty level, and cannot afford to make substantial monthly education loan payments and yet maintain a "minimal" standard of living.

■ In *Brunner* test terms, therefore, the first prong has been met. This is not changed by the fact that PHEAA is now offering to accept much-reduced payments, under its "Fair and Affordable Program." Unless it is willing to reduce the principal amount of the debt to whatever it receives after the Debtor pays a "fair and affordable" amount for a reasonable period of time and discharge the rest, PHEAA cannot raise the first-prong hurdle higher and higher for the Debtor by offering to take smaller and smaller payments.

---

3. Over the course of the three to five year life of a typical Chapter 13 plan, the different groups of creditors are paid at different points in time—first secured creditors, then priority creditors (such as tax claims), then non-priority (so-called "general") unsecured creditors.

Currently, out of the Goransons' $216.00 per month Plan payments, approximately $156.75 represents car payments. Additionally, for reasons unknown to the Court, Debtors have failed to make a § 522(f) motion to avoid a nonpossessory, nonpurchase-money security interest in ex-

empt household goods held by ITT Financial Services, resulting in an additional $51.04 per month distribution to that secured claim.

4. This would require forgoing any strip-down of the car lender's secured claim under § 506(a) and § 1322(b). Here, the Debtors will pay only $4,025.00, plus 9% as a present value factor and 5% on the unsecured deficiency, for the car, rather than the full loan balance ($8,093.67 on the petition date) plus 13.5% interest at the contract rate.

The second prong of the *Brunner* test is also satisfied here. Although the Debtor's useable skills, from all sources including her education,[5] might enable her at some point in the future to obtain employment at more than minimum wage, and although it will soon be possible for her to put both her children in school and day-care programs or otherwise to seek full-time employment, a change in this Debtor's ability to repay her student loans is not a realistic likelihood over the next several years. These Debtors are living near the official poverty level and are subsisting below it in many respects in order to preserve their car and to send their pre-schoolers to a church school.[6] When Ms. Goranson obtains full-time employment, some hardships might be lessened, but not to the point at which the repayment obligation would not be an "undue" hardship. This is because as her gross annual income goes from approximately $4,500 to perhaps even $10,000 or more at full-time employment, other costs of this family's living will necessarily increase, like child care, clothing, and food. Other costs also likely to increase are transportation, rent, utilities, and health care treatments and prophylaxes (eye exams, eye-glasses, dental care, immunizations, and other office visits, e.g.).

This is not a case of a debtor and family about to emerge from the burdensome years of a Chapter 13 plan into a more comfortable situation. It is a case of a family that will enjoy some increased income, but also will bear the expense of toddlers becoming schoolchildren, then pre-teens, and teenagers, etc.

Even if Mr. Goranson's pay could be expected to increase moderately at the same time that Ms. Goranson's doubles, this family can only hope to move from near poverty to a somewhat less dire proximity to that position.

As to the third prong of the *Brunner* test, good faith has been demonstrated by the amount of time elapsed since the loans first became due until the filing for Chapter 13 relief; the Debtor's pursuit of deferments; the length of time the Debtor labored in Chapter 13 before seeking discharge of these debts;[7] the fact that the failure to make more than minimal payments on the student loans prior to bankruptcy was a consequence of an inability to afford payments, rather than of irresponsible choices, high living, or a manifest effort to take the easy way out; the Debtor's diligent effort to obtain part-time employment (which she obtained); a good-faith reason currently to limit her employment to part-time employment; the fact that the Debtors' Plan is a maximum duration plan (60 months); and the fact that this Chapter 13 Plan is, by any measure, these Debtors' best effort.

All three prongs of *Brunner* having been satisfied, the Clerk is directed to enter judgment as follows: "Any order of discharge entered in favor of Carole Goranson in this bankruptcy case shall discharge any then unpaid balance of her obligation to Defendant Pennsylvania Higher Education Assistance Agency."

SO ORDERED.

---

5. *See Kraft* to the effect that the *Brunner* test does not permit a debtor to limit her job search to jobs in her chosen field. Here the Debtor has obtained employment in her field and has no skills that would qualify her for higher paying employment outside her field. She is "fully employed" to the extent that her family circumstances permit, and it turns out that employment in her field is no better or worse than employment outside her field.

6. They elect to subsist on $150 per month for food (for the family of four) so that they may devote a bit more than $100 per month to church school tuition for the two children.

7. As discussed above, the three to five year life of a Chapter 13 plan is a large window of opportunity for a debtor to elect to try to prove undue hardship. The nature of § 523(a)(8) and of the *Brunner* test is to directly correlate the relief obtainable by the debtor with how pathetic and hopeless she can demonstrate her circumstances to be. In some cases a debtor's prospects so improve over the course of three to five years as to jeopardize a showing of "undue hardship." In others, the circumstances deteriorate or modulate. In some instances, a decision to wait before filing the complaint might be consistent with "good faith," and that appears to the Court to be the case here.