**In re April Denise HECKATHORN, Debtor.**

**April Denise HECKATHORN, Plaintiff,**

**v.**

**UNITED STATES of America ex rel. U.S. DEPT. OF EDUCATION; Hemar Service Corporation of America; Hemar Insurance Corporation of America; Student Loan Marketing Association; IT Network; University of Tulsa; Eduserv Technologies, Inc.; and Northstar Guaranty, Inc., Defendants.**

**Bankruptcy No. 95–03541–W. Adv. No. 95–0376–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 9, 1996.

As Corrected Aug. 16, 1996.

Sheldon E. Morton, Tulsa, OK, for Plaintiff.

R. Michael Cole, Crowe & Dunlevy, Tulsa, OK, for HEMAR Insurance Corporation of America.

Mac D. Finlayson, Flowers & Finlayson, P.C., Tulsa, OK, for Northstar Guaranty, Inc.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Chief Judge.

This adversary proceeding under 11 U.S.C. § 523(a)(8)(B) was tried to the Court and briefed, and thereafter taken under advisement. Upon consideration of stipulations of fact and documents, evidence introduced and received, statements and arguments of counsel, and written briefs, and of the record herein, this Court, pursuant to F.R.B.P. 7052, now finds, concludes and orders as follows. Procedural history of the matter is included among "Findings of Fact."

## FINDINGS OF FACT

Plaintiff is April Denise Heckathorn ("April;" "Heckathorn"). She was formerly married and known as April Denise Dormont; but she is now divorced. She has one child, an 8-year-old son, who lives with her three and a half days per week pursuant to a joint custody arrangement. She neither receives nor pays child support, and there is no evidence that she either receives or pays spousal support, alimony, property division, or the like, from or to her former spouse.

In 1987, Heckathorn graduated from Northeastern State University ("Northeastern") with a B.S. degree. Heckathorn and her parents paid her way through Northeastern; no student loans were involved. After graduating from Northeastern, Heckathorn remained out of school for about one year (perhaps because of the birth of her son, which would have occurred at about this time).

In August 1988, Heckathorn entered the University of Tulsa Law School. Heckathorn's law school expenses were financed by a number of student loans.

By "student loans" this Court means loans made to finance educational benefits pursuant to the Guaranteed Student Loan Program established by the Higher Education Act of 1965. Under this program, the United States government does not directly provide funds for loans, but reinsures loans for educational purposes which are guaranteed by State or nonprofit agencies and made in the first instance by commercial lenders. As a result, the "lender" or loan obligee is a diffuse and shifting target. The program is supervised and ultimately backed by the United States of America ex rel U.S. Department of Education ("U.S.A."). In the present instance, the loans were guaranteed in part by Northstar Guaranty, Inc. ("Northstar") and in part by Hemar Insurance Corporation of America ("Hemar"). The loans were initially made by Norwest Bank of South Dakota, N.A. ("Norwest Bank"), to whom Heckathorn gave a number of promissory notes. The loans were apparently serviced by various intermediary entities, including EduServe Technologies Inc. of Utah ("EduServe") and Student Loan Marketing

Association ("Student Loan Marketing"). The notes were eventually assigned to the guarantors, Northstar and Hemar. For present purposes, Heckathorn's borrowings may be considered as constituting two series of transactions, one of which consists of notes guaranteed by and later assigned to Northstar, the other of which consists of notes guaranteed by and later assigned to Hemar.

In one series of transactions, from June 1988 through October 1990 Heckathorn borrowed an original total principal amount of $34,500.00 at interest rates ranging from 8%–10%, evidenced by six (6) notes given to Norwest Bank. By late 1994, these loans were being serviced by EduServe. From September 26, 1994 through April 10, 1995, EduServe assigned these 6 notes to Northstar.

In another series of transactions, from June 1988 through August 1990 Heckathorn borrowed an original total principal amount of $20,015 at variable interest rates, evidenced by three (3) notes (in the face amount of $33,500) given to Norwest Bank. By late 1995, these loans were being serviced by Student Loan Marketing. On October 12, 1995, Student Loan Marketing assigned these 3 notes to Hemar.

The nine (9) notes total an original principal amount of $68,000.00, of which some $54,515.00 was actually distributed to Heckathorn. All of this money was used by Heckathorn to pay her tuition and other costs of attending the University of Tulsa Law School and to support herself meanwhile by paying necessary expenses such as for lodging, food, and transportation including car payments.

In February 1991, when she was still in law school, Heckathorn began working in the office of the Tulsa County District Attorney. In May 1991, Heckathorn graduated from the University of Tulsa Law School with a J.D. degree; and in September 1991 she was admitted to practice law in the State of Oklahoma. In October 1991 she was not re-hired by the District Attorney's office, and for some nine (9) months was self-employed as a sole practitioner. From July 1992 through December 1993, she was employed as an attorney by Allen Mitchell, Inc. at a salary of $3,000 per month or $36,000 per year. From December 1993 through March 1994, she worked for FBG Realty, Inc. at a salary of $12 per hour or approximately $2,000 per month or $24,000 per year. After March 1994, she returned to the private practice of law as a sole practitioner. She currently represents mostly criminal misdemeanor clients, with some small claims and corporate work.

Since leaving the Tulsa County District Attorney's office, Heckathorn has applied for work at the District Attorney's offices in Okmulgee and Miami, Oklahoma, for Rogers and Creek Counties, Oklahoma, and again for Tulsa County; at the Tulsa Police Department and the Oklahoma City Police Department; at the Oklahoma State Bureau of Investigation and the Oklahoma Employment Service; at the police department for Seattle, Washington; at the Federal Bureau of Investigation, the U.S. Air Force Judge Advocate General (J.A.G.) Corps, the U.S. Department of Justice, the Environmental Protection Agency, and various Federal jobs in Connecticut, New York, Colorado, Texas, Wyoming and Montana; and at various private law firms and insurance companies—all without job offers.

The notes assigned to Northstar required monthly installment payments commencing at various times, with the first due on January 1, 1992. Her original repayment terms required installments of $463.57 per month. Heckathorn made the first few payments. Then, between August 1, 1992 and July 31, 1994, she was granted twenty-four (24) months of forbearance on various installments. Even so, she was in default as early as February 1, 1994. In all, Heckathorn repaid $4,351.72 on Northstar's notes. But by the end of October 1995, she owed Northstar principal and interest totalling $49,552.04.

Much the same thing happened regarding the notes assigned to Hemar. In all, Heckathorn repaid $1,055.24 on Hemar's notes, but defaulted in January 1995. By the end of October 1995, she owed Hemar principal and interest totalling $32,500.35.

The total principal and interest which Heckathorn owed to Northstar and Hemar on the student loans as of the end of October 1995 was $82,052.39. The notes assigned to Northstar also provide for payment of Northstar's reasonable attorney fees and collection costs incurred in enforcing the obligations. The notes assigned to Hemar also provide for payment of attorney fees and collection costs, and for late fees.

On November 8, 1995, Heckathorn filed her voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court. Gerald R. Miller was appointed and continues to serve as Trustee ("the Trustee") of Heckathorn's bankruptcy estate.

With her petition, Heckathorn filed schedules and statements as required by bankruptcy statutes and rules, disclosing her financial status and recent financial history.

In her Schedules A, B and D, Heckathorn reported owning the following property: her home, valued at $60,000.00 (subject to a first mortgage held by Mid–Continent Federal Savings Bank to secure debt of $58,000.00); one 1992 Ford Taurus automobile, valued at $8,525.00 (subject to a security interest held by Ford Motor Credit Company to secure debt of $10,000.00); one television set, valued at $1,230.00 (subject to a security interest held by Sears, Roebuck and Co. to secure debt of $1,230.24); various other items of personalty, including one 1994 Packard–Bell 486 computer, some office furnishings, a VCR and stereo, other furniture, clothing, jewelry, and one Browning pistol, valued at a total of $4,495.00; and accounts receivable valued at $20,000.00.

In her Schedule C, Heckathorn claimed all of her property exempt. The accounts receivable are patently not exempt under Oklahoma law, see 31 O.S. § 1(A); and the exempt status of some of the other items is questionable, see e.g. *In re McKaskle,* 117 B.R. 671, 676 (B.C., N.D.Okl.1990). Nevertheless, the Trustee apparently concluded that such items were of no value to the estate, for he filed no objection to the claims of exemption pursuant to 11 U.S.C. § 522(1), F.R.B.P. 4003(b); and reported no assets available for liquidation and distribution to creditors, see docket # 13. On the dubious practice of claiming groundless exemptions, see *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992).

In her Statement of Intention, Heckathorn declared her intention to reaffirm all her secured debts. She has in fact performed her intention, see reaffirmation agreements docket ## 9, 11, 19. Her agreement with Mid–Continent Federal Savings Bank obligates her to repay $55,603.04 at $570.00 per month, docket # 19. Her agreement with Ford Motor Credit Company obligates her to repay $10,684.83 at $397.51 per month. Her agreement with Sears, Roebuck and Co. obligates her to repay $1,230.24 at $35.00 per month.

In her Schedules E and F, Heckathorn reported owing no taxes or other priority debts, but owing $152,465.04 (later amended to $152,665.04) in general unsecured debts. Heckathorn's unsecured debt consists almost entirely of student loans, except for a couple of thousand dollars owed for telephone services, another couple of thousand owed on credit cards, and a few hundred owed on medical bills. The enormous total of student loans consists in part of duplicative listings of the many entities who may have been obligees on the debts now assigned to Northstar and Hemar.

In her Statement of Financial Affairs, Heckathorn reported her total gross income for 1993 as $18,000.00, for 1994 as $8,036.00, and for 1995 as $3,165.00, all of it "wages". In her Schedule I, Heckathorn reported regular income of $1,200 per month from wages, with "NONE" from any other sources, save "financial aid/gifts from her parents on an 'as needed' basis to supplement her income" in unspecified amounts. In her Schedule J and an attachment thereto (which in fact was appended to Schedule I), Heckathorn reported expenses of $2,762.51 per month, including $570 in home mortgage payment, $397.51 in car payment, $175 for utilities, $250 for food, $150 in miscellaneous other personal expenses, and $1,120 in business expenses, the latter including $300 per month for advertising (the largest single business expense), $275 for office rent, $205 for office utilities and telephone, $115 for "cellular phone and

pager," $125 in miscellaneous other business expenses, and $100 per month for "[t]ravel and entertainment". Except for the unspecified "financial aid/gifts from her parents," the net result was a deficit of income under expenses of -$1,562.51 per month or -$18,750.12 per year.

With her petition, Heckathorn also filed her complaint commencing this adversary proceeding, wherein she seeks discharge under 11 U.S.C. § 523(a)(8) of "various student loans in the principal sum of approximately $80,000.00," complaint ¶ 2, on the ground that

she has insufficient current or anticipated income or other sources of funds to support herself and her dependent, and excepting the student loans from discharge will impose an undue hardship on them[,]

*id.* ¶ 3. She admitted being uncertain of how much she owed and to whom, and sought to "place the burden of proof of each claim on the holder," *id.* ¶ 2. Heckathorn apparently listed and served as a defendant every entity she knew of who might be a student loan creditor; and in addition, Hemar joined itself as a defendant, see adv. docket ## 17, 19. No defendants answered save Northstar and Hemar; with their answers, Northstar and Hemar counterclaimed for amounts due under the notes, including interest, fees and costs.

On April 3, 1996, Heckathorn and Northstar filed their "Joint Stipulations of Facts and Documents ..." On April 8, 1996, the matter came on for trial to the Court. Heckathorn appeared in person with her attorney, Sheldon E. Morton; Northstar appeared by its attorney Mac D. Finlayson; and Hemar appeared by its attorney R. Michael Cole. Evidence was introduced and received, including documents and the testimony of witnesses; and statements and arguments of counsel heard. After trial, the Court allowed time for briefing. Heckathorn filed her "... Suggested Findings of Fact, Suggested Conclusions of Law and Brief in Support;" Northstar filed its "Trial Brief ...;" and Hemar filed its "Brief in Objection ..." Thereafter, the Court took the matter under advisement.

In her stipulations and testimony at trial, Heckathorn declared that her gross income after March 1994 has been approximately $1,200.00 per month or $14,400 per year. Heckathorn also estimated the "financial aid/gifts from her parents" to be at least $8,000.00 per year and probably more. Her mother, Nancy Heckathorn, testified that such "financial aid/gifts" amounted to about $500.00—$650.00 per month. It appeared that, over an 18-month period before trial, Heckathorn's parents had from time to time paid for Heckathorn's mortgage payments, her car insurance, and her groceries.

Heckathorn's tax return for the year 1995 reported gross income from her law practice of $27,125.00 and expenses of $20,496.00 for a net of $6,629.00. Heckathorn's profit-loss statement for January 1, 1996 through April 5, 1996 reported gross income from her law practice of $7,679.43 and expenses of $7,839.20 for a net loss of -$159.77. The expenses reported during the period include $325.00 for "Entertainment" and $165 unspecified "Other Exp[enses]." Heckathorn testified that the "entertainment" consisted of taking other lawyers to lunch. She had no explanation for the "other expenses".

It is stipulated that neither Heckathorn nor her son suffers from any chronic physical, medical or mental disability.

### CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), (O), 11 U.S.C. § 523(a)(8)(B).

■ Heckathorn is plaintiff in this adversary proceeding, and as such bears the burden of establishing the dischargeability of debts in some definite amount. Her attempt to shift the burden of proof to her creditors is ineffective. However, Northstar and Hemar are counter-claimants for amounts due on their notes, and as such bear the burden of establishing the amounts due. Without serious contest, Northstar and Hemar have proven that they are owed a total of $82,052.39 as of the date Heckathorn filed bankruptcy, plus interest since accrued at various ascertainable rates.

■ The crux of this adversary proceeding is not the amount, but the (non)dischargeability, of the student loan debts. Heckathorn

asserts that payment of these debts would "impose an undue hardship" on her and her son within the meaning of 11 U.S.C. § 523(a)(8)(B). "Undue hardship" is not defined by the Bankruptcy Code, but is left to the courts to determine.

As this Court has previously held, "undue hardship" in § 523(a)(8)(B) means

... something more than "a tight budget or present inability to pay;" but this "something more" cannot be reduced to rigid rule or simple formula, but depends on "the totality of the circumstances involved" in light of Congressional intent and policies in administering *both* bankruptcy relief and the student loan program[,]

*In re Claxton,* 140 B.R. 565, 568 (B.C., N.D.Okl.1992) (emphasis original) quoting *In re Johnson,* 121 B.R. 91, 93 (B.C., N.D.Okl. 1990). The Congressional policy of promoting enterprise by providing honest but unfortunate debtors in bankruptcy with a "fresh start," is qualified by the Congressional policy of promoting higher education by means of student loans whose repayment may be delayed or modified but is seldom discharged. It is Congress' policy to provide higher education; it is not Congress' policy to provide it free.

The extraordinary importance placed by Congress on repayment of educational loans impels this Court to place a heavy burden on debtors who would have such loans discharged[,]

*In re Claxton,* 140 B.R. p. 569. Debtors must show, of course, that they cannot reasonably be expected to make payments on their student loans now, at the time of bankruptcy. Some courts look no further, focusing entirely on circumstances "at present," *In re Skaggs,* 196 B.R. 865, 868 (B.C., W.D.Okla.1996). But this Court expects debtors to show also that they cannot reasonably be expected to make payments on their student loans in the foreseeable future.

"The totality of circumstances" includes both circumstances at commencement of the case and circumstances thereafter. Designating any particular "time" for determination of undue hardship as a matter of law is unrealistic and must disregard some relevant circumstances[,]

*id.* pp. 568–569. Indeed, future prospects may be even more important than present conditions. Few people step directly from graduation into a high-paying job; for most, the full economic benefits of higher education may be reaped only after a further postgraduate period of accumulating experience and deepening maturity. During this postgraduate period of continuing education in the school of hard knocks, it is *normally to be expected* that the repayment of student loans incurred over a number of years in substantial amounts would present considerable hardship. If this is "undue hardship," then most student loans will be dischargeable. But Congress did not intend most student loans to be dischargeable. Therefore, present inability to pay may, in many or most cases, be taken as mere "normal" hardship; determination of "undue" hardship for purposes of § 523(a)(8)(B) requires consideration of future prospects too.

Here, Heckathorn has proven to this Court's satisfaction that (despite various irregularities in her statements and schedules, including overstatement of her debt, some inflation of expenses, and understatement of income, especially of contributions from her parents) she cannot reasonably be expected to make any repayments on her outstanding student loans at this time. On the other hand (despite her considerable list of failed or refused employments) Heckathorn has not persuaded this Court that she cannot reasonably be expected to make any repayments on her outstanding student loans in the foreseeable future. She is a highly educated professional in a highly practical field, now with some five years of experience. There is no evidence that her unemployability is incurable. There is no evidence that her continued self-employment will remain unremunerative. However, it is clear that, the longer repayment is delayed, the more will have to be repaid, due to the accumulation of interest.

What, then, is to be done in a case such as this, where the ability to repay may improve in future, but the amount to be repaid will increase in future?

Some courts have held that (non)dischargeability of student loan debts is an all-

or-nothing proposition. As one such court explained,

> On its face [§ 523(a)(8)(B) ] is clear, unambiguous and does not conflict with the overall scheme of the Bankruptcy Code. "Debt" is defined in [§ ] 101(12) of the Bankruptcy Code as "liability on a claim." Plainly understood, "liability on a claim" encompasses the entire liability, not merely some portion of the debt or merely selected terms of repayment. Congress might have used language to authorize the discharge of partial liability or the modification of conditions of liability but did not. [§ ] 523(a)(8)(B) itself limits a court's power to act only on the entire student loan obligation.
>
> This court recognizes that some other bankruptcy courts have been willing to modify student loan terms or discharge portions of the debt. These courts have interposed broad equitable powers when applying [§ ] 523(a)(8)(B), stating their disapproval of the "inequity" which can result from a strict application of [§ ] 523(a)(8)(B). The perceived inequity, according to these courts, is the rewarding of irresponsible debtors who create their own hardship by borrowing excessively and unrealistically for their education by discharging their student loans, while punishing the debtor who has borrowed more frugally and for whom, therefore, repayment is not an "undue hardship."
>
> Although the policy argument that an irresponsible debtor should not be rewarded is interesting, it is an argument better made to Congress than to the courts. The courts are not granted power to remedy perceived defects in legislation by the failure of Congress to legislate precisely or equitably. If application of statutory provisions as written causes "untoward, unwelcome, arbitrary or fortuitous results it is for Congress to deal with any perceived bad policy." ...
>
> So the court's authority to determine dischargeability of student loans is limited strictly to a determination of whether a discharge of the entire debt is required[,]

*In re Skaggs*, 196 B.R. pp. 866–867 quoting *In re Horwitz*, 167 B.R. 237, 240 (B.C., W.D.Okl.1994).

This Court respectfully disagrees, for several reasons.

A statute must be read in context; and § 523(a)(8)(B) has an extensive context. The Bankruptcy Code is embedded in equity and must be read accordingly:

> Good sense and legal tradition alike enjoin that an enactment of Congress dealing with bankruptcy should be read in harmony with the existing system of equity jurisprudence of which it is a part[,]

*Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. 434, 457, 60 S.Ct. 1044, 1054, 84 L.Ed. 1293, 1304 (1940). Certain provisions of the Code are not merely "embedded in" but grow directly from equity and equitable remedies. In particular, the bankruptcy discharge is an injunction, 11 U.S.C. § 524(a)(2); and provisions relevant thereto, in particular §§ 523, 727 which effectively shape the injunction, should be read as an expression of the equitable nature, function, and (it necessarily follows) behavior of the injunctive remedy, *In re Szafranski*, 147 B.R. 976, 980–981 (B.C., N.D.Okl.1992). It is therefore entirely proper to read the exceptions to discharge in § 523(a), including (8)(B) thereof, in light of equity.

> While a bankruptcy court cannot, because of its own notions of equitable principles, refuse to award the relief which Congress has accorded the bankrupt, the real question is, what is the relief which Congress has accorded the bankrupt ...?

*Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. p. 457, 60 S.Ct. p. 1054, 84 L.Ed. p. 1304.

In determining "what ... relief ... Congress has accorded ...," the court begins with the statutory language. In § 523(a)(8)(B), the operative term "undue hardship" is undefined. Although the words "undue" and "hardship" are common English words, their combination in this statute obviously constitutes a term of art, i.e., a phrase with a particular legal meaning and function, which is based on but may be more special-

ized than common usage. (Compare "fiduciary capacity" in § 523(a)(4), which has long been given a meaning narrower than common usage, see *In re Turner*, 134 B.R. 646, 648–656 (B.C., N.D.Okl.1991); and the term "malicious" in § 523(a)(6), which has been given a meaning broader than the common understanding of "with desire to do harm," see *In re Culp*, 140 B.R. 1005, 1014–1015 (B.C., N.D.Okl.1992).) A statute whose operative term is undefined is often not "clear [and] unambiguous." The meaning must be determined; making such determination is the proper function of the courts; and the courts do their job by looking to

> considerations growing out of the public policy of the Act found both in its legislative history and in an analysis of its terms, and of the authority of the court clothed with equity powers and sitting in bankruptcy to give effect to that policy[,]

*Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. p. 448, 60 S.Ct. p. 1049, 84 L.Ed. p. 1299. As long as the policy considered is that of Congress (not of the judge), the court is performing its proper role in our system of separated powers.

The words "undue hardship" suggest a matter of degree. Financial hardship is not all-or-nothing, but is more or less. The load may be made bearable by reducing, rather than eliminating, it.

Legislative history includes not only "the scheme of the Bankruptcy Code" but the "scheme" of several higher-education acts as well, at least from the Higher Education Act of 1965 to the present, 3 *Collier on Bankruptcy* (15th ed. 1996) ¶ 523.18. That legislative history reveals increasing Congressional concern with two separately-desirable but mutually-conflicting goals: the debtor's "fresh start" versus the funding of student loans. In its latest expression of law on the subject, Congress sought to reconcile these goals under the rubric of "undue hardship". Reconciliation is not all-or-nothing; it often requires mutual concession and adjustment. The partial dischargeability or other modification of a student loan debt, to the extent its payment is an undue hardship, but no further, accomplishes both Congressional pur-

poses of providing debtors with a "fresh start" while maximizing student loan repayment. Insisting on complete discharge or complete repayment unnecessarily sacrifices one policy to the other.

It is true that a court may not revise a statute merely because the judge finds the statutory result "'untoward [or] unwelcome,'" *In re Skaggs*, 196 B.R. p. 867 quoting *In re Horwitz*, 167 B.R. p. 240. It is not true that a court must apply the literal words of a statute even when the result is "'arbitrary or fortuitous,'" *id.* It is an established canon of statutory construction and interpretation that a court need not, and indeed should not, read and apply a statute in a manner which leads to an "absurd" result—meaning a result which furthers no purpose, i.e. is "arbitrary or fortuitous."

> What is the test of absurdity? The contradiction of reason, it may be said, and to make an immediate application to legislation, the contradiction of the reason which grows out of the subject matter of the legislation and the purpose of the legislators[,]

*Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 451, 21 S.Ct. 906, 911, 45 L.Ed. 1171, 1179 (1901). The correct rule is stated elsewhere in *In re Skaggs* itself: a court should not read and apply a statute in a manner "'demonstrably at odds' with the legislative scheme," 196 B.R. p. 866. See e.g. *Conroy v. Aniskoff*, 507 U.S. 511, 516–518 and n. 12, 113 S.Ct. 1562, 1566–1567 and n. 12, 123 L.Ed.2d 229, 237 (1993); *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 610 n. 4, 111 S.Ct. 2476, 2484 n. 4, 115 L.Ed.2d 532 (1991); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454–455, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377, 391–393 (1989); *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298–299 (1989); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973, 980–981 (1982); *Perry v. Commerce Loan Co.*, 383 U.S. 392, 399–400, 86 S.Ct. 852, 856–857, 15 L.Ed.2d 827, 833–834 (1966); *Commissioner v. Brown*, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75, 82 (1965); *U.S. v. American Trucking Associations, Inc.*, 310 U.S. 534, 544 and nn.

19, 20, 60 S.Ct. 1059, 1064 and nn. 19, 20, 84 L.Ed. 1345, 1351 (1940); *Church of the Holy Trinity v. U.S.*, 143 U.S. 457, 459–462, 12 S.Ct. 511, 512–513, 36 L.Ed. 226, 228–229 (1892); *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1299 (10th Circ.1996); *U.S. v. Gonzales*, 65 F.3d 814, 819–820 (10th Circ. 1995); *U.S. v. Killion*, 7 F.3d 927, 935–936 (10th Circ.1993); *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1564 (10th Circ.1993); *Ewing v. Rodgers*, 826 F.2d 967 (10th Circ.1987); *In re Rodman*, 792 F.2d 125 (10th Circ.1986).

■ The policy underlying § 523(a)(8)(B) is dual. It requires accommodating *both* the discharge of debt in furtherance of debtor's "fresh start" *and* the exception from discharge of student loan debts which may be repaid. It is demonstrably at odds with this dual purpose to require in all cases either complete discharge or complete nondischarge of the student loan debt. Such all-or-nothing rule would in some cases result in insufficient repayment, in others in insufficient discharge, regardless of a debtor's particular circumstances including degree of hardship and future prospects—a result which would be "arbitrary and fortuitous" and, for purposes of § 523(a)(8)(B), absurd.

■ Accordingly, this Court declines to insist on such result. The Congressional scheme is better carried out by permitting partial discharge or other modification of the student loan debt, according to the circumstances. Under § 523(a), complete discharge or nondischarge is the usual rule, and the same shall remain so under § 523(a)(8)(B); but under the latter statute, some variance from the general rule may be permitted, especially where such variance merely reflects an actual situation wherein present inability to pay need not continue indefinitely. Accord, *Griffin v. Oklahoma State Regents for Higher Education, et al.*, 197 B.R. 144 (B.C., E.D.Okl.1996) and cases cited therein; *In re Mayes*, 183 B.R. 261 (B.C., E.D.Okl.1995); unpublished "Order" on appeal in Case No. 91–C–0974–E United States of America v. Jack Leroy David (N.D.Okl. 3/23/93).

Here, Heckathorn can only be expected to repay her student loans in future; but in future, the continuing accumulation of interest will increase the size of the debt to be repaid. The solution is to abate the threat of collection and the accumulation of interest long enough to enable Heckathorn to improve her repayment capacity.

This Court determines and concludes that Heckathorn's debts, of $49,552.04 as of the end of October 1995 plus interest to date owed to Northstar and $32,500.35 as of the end of October 1995 plus interest to date owed to Hemar, are not discharged (or are excepted from discharge) pursuant to 11 U.S.C. § 523(a)(8)(B), provided, however, as follows: that no execution on said debts shall issue for a period of five (5) years from the date of filing of this order; that no further interest shall accrue on said debts during a period of three (3) years from the date of filing of this order, and thereafter shall accrue only from the end of said three-year period forward; that upon the expiration of said three-year period, Heckathorn shall pay to each of Northstar and Hemar the sum of Five hundred dollars ($500.00) per month for a further period of two (2) years; and that upon the expiration of said two-year period, or a total period of five (5) years from the date of filing of this order, let execution issue. Judgment shall be entered accordingly. Northstar and Hemar shall prepare and submit, jointly or separately at their option, the appropriate form(s) of judgment.

AND IT IS SO ORDERED.